PEOPLE v KELLY

Docket No. 64363. Submitted August 16, 1984, at Lansing.—Decided
December 17, 1985. Leave to appeal applied for.

Defendant, Leo E. Kelly, Jr., was convicted of two counts of first-
degree murder, Washtenaw Circuit Court, Ross W. Campbell, J.
Defendant appealed, alleging numerous errors. *Held:*

1. Defendant gave notice of an insanity defense. He was
examined regarding criminal responsibility at the Center for
Forensic Psychiatry and he claimed that he was suffering
amnesia as to the 18 hours immediately preceding his arrest.
Defendant did not cooperate with the Forensic Center doctors'
wishes to interview him under the influence of sodium brevitol
or hypnosis. For that and other failures to cooperate, the
prosecutor filed a motion to strike the insanity defense. The
*proceedings eventually resulted in defendant's agreeing to take*
a polygraph examination as an initial screening device to test
his veracity with respect to the claim of amnesia. The court
ruled that, if defendant refused to take the test, he would be
barred from presenting evidence on insanity at trial. The two
Forensic Center doctors assigned to evaluate defendant ob-
served the test and concluded that no further tests were
required. Defendant moved to exclude the results of the poly-
graph examination and to disallow the testimony of the two
doctors. The court ruled that the doctors could testify as to
their opinions formulated prior to the test but could not render
any opinions based to any extent on the polygraph. The test
results were accordingly excluded. Defendant contended on

REFERENCES

Am Jur 2d, Criminal Law §§ 65-70, 938.

Am Jur 2d, Jury §§ 136-188, 303, 304.

Propriety and prejudicial effect of informing jury that witness in
criminal prosecution has taken polygraph test. 50 ALR4th 824.

Use of peremptory challenge to exclude from jury persons belong-
ing to a class or race. 79 ALR3d 14.

Pretrial publicity in criminal case as ground for change of venue.
33 ALR3d 17.

Propriety and prejudicial effect of informing jury that accused had
taken polygraph test, where results of test would be inadmissible
in evidence. 8 ALR3d 227.

appeal that the court erred by compelling defendant to submit to the polygraph test and by allowing the doctors to give tainted testimony. Defendant argued that the polygraph results effectively reached the jury through the doctors' testimony, and in the worst possible way because the jury was unaware of the doubts which the doctors sought to dispel through the polygraph test. The polygraph examination did not violate defendant's Fifth Amendment right against self-incrimination, since the psychiatric evaluation at the Forensic Center following such a plea is not for the purpose of determining guilt but criminal responsibility. Nor did it violate defendant's Fourth Amendment protection from unreasonable searches and seizures. There is no likelihood that the jury relied on the polygraph testing or results because that evidence was suppressed and a review of the record indicates that the testimony of the two Forensic Center doctors was independent of the polygraph testing. The mere fact that they knew of suppressed evidence did not render them incompetent to testify.

2. The court did not err in denying a defense motion for a change of venue.

3. To establish a prima facie violation of the right to a jury drawn from a representative cross section of the community, a defendant must show (1) that the allegedly excluded group is a "distinctive" group in the community, (2) that the group is unfairly and unreasonably underrepresented in venires from which juries are drawn, and (3) the underrepresentation is due to systematic exclusion of the group in the jury selection process. Defendant's claim that he was denied his constitutional right to a jury drawn from a representative cross section of the community is not supported by the record.

4. Defendant was not denied a fair trial by the prosecutor's use of peremptory challenges to exclude all blacks from the jury.

5. The trial court gave appropriate instructions on the insanity defense prior to the introduction of expert testimony on the issue.

6. The court did not abuse its discretion in admitting photographs displaying defendant's books, a handwritten list of names including the names of the victims and another sheet of paper lawfully seized from defendant's room.

Affirmed.

1. CRIMINAL LAW — INSANITY — POLYGRAPH EXAMINATIONS — SELF-INCRIMINATION — FIFTH AMENDMENT.

A polygraph examination of a defendant conducted by the Foren-

sic Center as part of its psychiatric evaluation following a plea of not guilty by reason of insanity does not violate the defendant's Fifth Amendment right against self-incrimination (US Const, Am V).

2. JURY — PRETRIAL PUBLICITY — NEWSPAPERS.

A juror, although having formed an opinion from reading newspaper reports, is competent upon swearing that he or she is without prejudice and can try the case impartially according to the evidence and the court is satisfied that the juror will do so.

3. JURY — APPEAL.

A challenge to a jury array must be filed in writing before the jury is sworn.

4. JURY — REPRESENTATIVE CROSS SECTION OF THE COMMUNITY.

To establish a prima facie violation of the right to a jury drawn from a representative cross section of the community, a defendant must show (1) that the allegedly excluded group is a "distinctive" group in the community, (2) that the group is unfairly and unreasonably underrepresented in venires from which juries are drawn, and (3) the underrepresentation is due to systematic exclusion of the group in the jury selection process.

5. CRIMINAL LAW — JURY SELECTION — PEREMPTORY CHALLENGES — DUE PROCESS — IMPARTIAL JURIES.

Use of a peremptory challenge is absolute and precludes inquiry into the motives or mental attitudes of the party exercising the challenge, and, where the result of the use of peremptory challenges by a prosecutor is to remove blacks from a jury, the use does not constitute a violation of a defendant's right to due process and to trial by an impartial jury.

*Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, *William F. Delhey*, Prosecuting Attorney, and *Marilyn A. Eisenbraun*, Assistant Prosecuting Attorney, for the people.

*Edison, Davis & Lumumba* (by *Chokwe Lumumba*), and *Greenspon, Scheff & Washington* (by *Eileen Scheff*), of counsel, for defendant.

Before: CYNAR, P.J., and WAHLS and S. T. FINCH,* JJ.

PER CURIAM. On June 21, 1982, defendant was convicted by a jury of two counts of first-degree murder, MCL 750.316; MSA 28.548. Sentenced to concurrent life prison terms, he appeals as of right.

This case involves an early morning fire bombing and shooting in the sixth-floor hallway of the Douglas wing of Bursley Hall, a predominantly freshman dormitory at the University of Michigan in Ann Arbor. Michael Neumann testified at trial as to how the incident began. He had stayed up Thursday night to type a paper so that he could go home for the Easter weekend. About 3 a.m. Friday, April 17, 1981, Neumann heard defendant enter the hallway and saw him pass by the study-room door. About 6 a.m., Neumann went down the hall to his room to get something with which to kill a bee in the study room. As he passed defendant's room, he met defendant standing in the doorway and asked if defendant was allergic to bees. Defendant replied no and slammed the door. Neumann returned to the study room and stopped at the doorway to look for the bee. Defendant then came running out of his room with a flaming bottle which he threw at Neumann. The bottle bounced, careened off Neumann and broke against the end wall. Neumann yelled and fled down the stairway exit at the end of the hall. A series of fires sprang up in the hallway where the bottle had spilled burning gasoline.

Peter Doerr, a student in one of the rooms near the end of the hallway, heard the glass break and someone yell. He got out of bed and went into the hallway where he saw several fires burning and

---

* Circuit judge, sitting on the Court of Appeals by assignment.

defendant standing with a sawed-off shotgun held across his body. The gun discharged and Doerr fled back into his room.

Other students in the end rooms were awakened by the commotion and, upon going into the hallway, immediately gave their attention to the fires. Defendant fired two more shots, scattering these students but not wounding any. Other students who were awakened or entering the hallway apparently were unaware that a gun was being fired, but assumed the bangs were explosions. Someone pulled a fire alarm. While some left the hall, others ran about in confusion and still others went from door to door to warn those still oblivious to what was happening. Neumann's roommate awoke Edward Siwick, who in turn began helping to awake others. In the meantime, Douglas Mc-Greaham, a resident advisor, arrived on the floor in response to the fire alarm with another advisor and the supervisor.

Defendant fired two more shots and Siwick and McGreaham fell dead. Defendant then returned to his room where he was arrested. A search warrant was issued and numerous items seized, including a shotgun, ammunition, a gas mask and materials that could be used in the preparation of "Molotov cocktails".

I

Defendant gave notice of an insanity defense. He was examined regarding criminal responsibility at the Center for Forensic Psychiatry and he claimed that he was suffering amnesia as to the 18 hours immediately preceding his arrest. Defendant did not cooperate with the Forensic Center doctors' wishes to interview him under the influence of sodium brevitol or hypnosis. For that and other

failures to cooperate, the prosecutor filed a motion to strike the insanity defense. The proceedings eventually resulted in defendant's agreeing to take a polygraph examination as an initial screening device to test his veracity with respect to the claim of amnesia.

The lie detector test was administered and defendant was questioned only about his claim of amnesia, not about his guilt or sanity. The two Forensic Center doctors assigned to evaluate defendant observed the test and concluded that no further tests were required.

Defendant moved to exclude the results of the polygraph examination and to disallow the testimony of the two doctors, Lynn Blunt and Harley Stock. The court ruled that the doctors could testify as to their opinions formulated prior to the test, but could not "render any opinions based to any extent on the polygraph". The test results were accordingly excluded.

Defendant now contends that the court erred by compelling defendant to submit to the polygraph test and by allowing the doctors to give "tainted" testimony. Defendant argues that the polygraph results effectively reached the jury through the doctors' testimony, and in the worst possible way because the jury was unaware of the doubts which the doctors sought to dispel through the polygraph test.

Defendant was not affirmatively ordered to submit to the polygraph examination. However, if he had refused to take the test, he would have been barred from presenting testimony on insanity at trial. MCL 768.20a(4); MSA 28.1043(1)(4). See *People v Hayes*, 421 Mich 271; 364 NW2d 635 (1984). We are presented with no sufficient reason, though, why the center may not include a polygraph test in its battery of exams.

Defendant claims the test violated his Fifth Amendment right against self-incrimination. The privilege against self-incrimination turns "upon the nature of the statement or admission or the exposure it invites". *Estelle v Smith,* 451 US 454, 462; 101 S Ct 1866; 68 L Ed 2d 359 (1981). "A plea of not guilty by reason of insanity is not a plea that incriminates." *People v Martin,* 386 Mich 407, 427; 192 NW2d 215 (1971), *cert den sub nom Lewis v Michigan* 408 US 929; 92 S Ct 2505; 33 L Ed 2d 342 (1972). The psychiatric evaluation at the Forensic Center following such a plea is not for the purpose of determining guilt but criminal responsibility. Accordingly, the psychiatric evaluation as mandated by the statute does not itself violate defendant's Fifth Amendment rights. 386 Mich 426-427. Defendant injected the issue of insanity into the case, and his full cooperation at the evaluation is necessary if the prosecutor is to have effective means of meeting defendant's proofs. *Estelle, supra,* p 466.

Defendant claims that the polygraph test was an unreasonable search and seizure violating his Fourth Amendment rights. We remain unconvinced. *Rochin v California,* 342 US 165; 72 S Ct 208; 96 L Ed 2d 183 (1952), and *People v Scott,* 145 Cal Rptr 876; 578 P2d 123 (1978), which defendant cites, are readily distinguishable as involving substantial intrusions of the defendants' privacy and dignity, in one case the forcible extraction of stomach contents and in the other the prolonged massage of the prostate gland through the rectum.

On the record before us, we do not perceive that the administration of the polygraph examination was unlawful. Nor do we perceive that it tainted the trial. *People v Towns,* 69 Mich App 475; 245 NW2d 97 (1976); *People v Dockery,* 65 Mich App 600; 237 NW2d 575 (1975), and *People v Liddell,* 63

Mich App 491; 234 NW2d 669 (1975), are not on point. In each of those cases, evidence of polygraph results was injected into the proceedings and it was reasonably likely that the court relied on the evidence in sentencing, determining competency or reaching a plea. In this case, there is no likelihood that the jury relied on the polygraph testing or results because that evidence was suppressed. On the one occasion the court might have relied on the evidence, it chose not to grant the prosecution's motion to strike.

We are persuaded on our review of the record that the testimony of the two Forensic Center doctors was independent of the polygraph testing. The mere fact that they knew of suppressed evidence did not render them incompetent to testify.

II

Defendant asserts that the trial court erred in denying his motions for change of venue. He argues that he was denied his rights to due process of law and an impartial jury where massive prejudicial pretrial publicity was known to the jury array.

We review for abuse of discretion. *People v Duby,* 120 Mich App 241, 246; 327 NW2d 455 (1982), *lv den* 418 Mich 967 (1984). The existence of pretrial publicity alone does not necessitate a change of venue. *People v Prast (On Rehearing),* 114 Mich App 469, 477; 319 NW2d 627 (1982). A juror, although having formed an opinion from reading newspaper reports, is competent upon swearing that he or she is without prejudice and can try the case impartially according to the evidence and the court is satisfied that the juror will do so. *People v Gibbs,* 120 Mich App 485, 491; 328 NW2d 65 (1982).

In this case, the court took extraordinary care in the jury voir dire. First, general questions were asked of the jurors together and their answers noted. Individual voir dire followed. The jury selection consumed four days during which about 80 jurors were individually questioned, 30 were dismissed for cause and the 20 defense and 15 prosecution peremptories were all exercised. Upon defense counsel's final motion for change of venue following the completed selection of the jury, the court concluded that the jury was "not contaminated in any way by pre-trial publicity or the existence of the Hinckley trial". The court further concluded that the jury met every test that the law provided and could decide the issues based on the evidence produced in open court and the law as the court instructs it. See *People v Gerald Hughes,* 85 Mich App 8, 16; 270 NW2d 692 (1978).

We have reviewed the jury voir dire and agree with the court below that defendant was not prejudiced in the selection and make-up of the jury.

### III

Defendant contends that he was denied his constitutional right to a jury drawn from a representative cross section of the community. We can grant defendant no relief because his claim is merely a conclusory allegation not supported by record facts.

A challenge to a jury array must be filed in writing before the jury is sworn. *People v McCrea,* 303 Mich 213; 6 NW2d 489 (1942), *cert den* 318 US 783; 63 S Ct 851; 87 L Ed 1150 (1943); *People v Stephen,* 31 Mich App 604; 188 NW2d 105 (1971), *lv den* 384 Mich 843 (1971). Defendant concedes that no such challenge was filed.

On the last day of jury voir dire, defense counsel

stated his dissatisfaction with the small number of blacks on the jury panel, acknowledged that he understood that Washtenaw County in general did not have a problem with placing blacks on the jury, but expressed his desire to investigate further. After a discussion with the jury commissioner, counsel conceded that he could find no evidence indicating overt or intentional racial exclusion. Nevertheless, counsel stated his belief that jury selection from voter registration lists consistently and repeatedly over-excluded blacks. Counsel did not offer any proofs or request a hearing.

To establish a prima facie violation of the right to a jury drawn from a representative cross section of the community, a defendant must show (1) that the allegedly excluded group is a "distinctive" group in the community, (2) that the group is unfairly and unreasonably underrepresented in venires from which juries are drawn, and (3) the underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v Missouri,* 439 US 357; 99 S Ct 664; 58 L Ed 2d 579 (1979). The people agree that blacks are a distinctive group in Washtenaw County. We find no record support for the latter two requirements, however.

## IV

Defendant also contends that he was denied a fair trial by the prosecutor's use of peremptory challenges to exclude each of the five blacks who were individually voir dired. One was excused after the prosecutor's challenge for cause was denied. The prosecutor stated flatly to the trial court that race was not a consideration and that, indeed, he had passed the jury for both cause and peremptory challenges while the jury included the jurors in question.

Defendant acknowledges that present law provides him with no relief. *Swain v Alabama,* 380 US 202; 85 S Ct 824; 13 L Ed 2d 759 (1965); *People v Roxborough,* 307 Mich 575; 12 NW2d 466 (1943), *cert den* 323 US 749; 65 S Ct 80; 89 L Ed 600 (1944), and *People v Hence,* 110 Mich App 154; 312 NW2d 191 (1981). Nevertheless, defendant argues that *Swain* and *Roxborough* should be re-examined in light of *People v Wheeler,* 22 Cal 3d 258; 148 Cal Rptr 890; 583 P2d 748 (1978), and *Commonwealth v Soares,* 377 Mass 461; 387 NE2d 499 (1979), *cert den* 444 US 881; 100 S Ct 170; 62 L Ed 2d 110 (1979). As an intermediate appellate court, we do not view it as our function to perform the overhaul of the law that defendant requests.

## V

Defendant contends that the trial court failed to instruct the jury on the insanity defense prior to expert testimony on the issue as required by MCL 768.29a(1); MSA 28.1052(1)(1). Our review of the record reveals that the appropriate instructions were given on the first day of trial after the medical examiners testified but before any evidence was offered as to sanity. Therefore, this issue affords defendant no relief.

## VI

Defendant argues that the court's remarks during jury voir dire left the jurors with the erroneous impression that the defendant had the burden of proving insanity and that the correct instructions at the end of trial were too little, too late to dispel the jury's earlier confusion. We disagree. First, we note as in issue V, *supra,* that the court gave an instruction on the insanity defense on the

first day of trial which correctly stated that the prosecutor carried the burden of proof. Second, while certain remarks of the court might be construed as suggesting that defendant had the burden of proof, the remarks were made during individual voir dire of jurors who were later excused for cause. Accordingly, we find no merit in defendant's claim that the jury was confused.

## VII

Defendant lastly assigns error to the admission into evidence of several photographs of his books and of two items lawfully seized from his room. In each instance, defendant claims that the probative value of the evidence was so minimal and its prejudicial effect so great that the trial court abused its discretion in admitting the evidence. See MRE 403. The people respond that the evidence was probative both of premeditation and sanity and was "prejudicial" only in the sense that it tended to prove that defendant was guilty of first-degree murder.

We find no abuse of discretion on the part of the trial court. The photographs displayed defendant's books. Most of the books were textbooks and other books for defendant's classes. Defendant objected to the few which were on marksmanship and the martial arts and those on black-oriented sociological and historical materials. After admission of the photographs, defendant acknowledged that the books shown were his own.

One of the items admitted was a list of handwritten names, including Michael Neumann's and Edward Siwick's. Defendant testified that the list was a memory aid, and that he added names as he met people in the dormitory.

The second item was a single page with "Civil

Rights Movement 1950-1964, *Brown v Board of Education, Topeka, Kansas"* written on it as well as the underscored note "It's all meaningless. This is it." Defendant identified the item as the title page from a political science paper he was writing but he could not recall the additional note written on it.

The above evidence had some tendency to prove defendant's state of mind. Unlike the evidence considered in *People v DeRushia,* 109 Mich App 419; 311 NW2d 374 (1981), this evidence did not lack temporal proximity to the murders. Nor did the exhibits inject evidence of another crime into the trial, as occurred in *People v Roeder,* 79 Mich App 595; 262 NW2d 872 (1977). The evidence was not attenuated from proof of the elements of the crime charged, as was true in *People v Morris,* 92 Mich App 747; 285 NW2d 446 (1979), *lv den* 408 Mich 919 (1980). We remain unpersuaded that admission of the evidence constituted an abuse of discretion.

Affirmed.