PEOPLE v HUBBARD (AFTER REMAND)

Docket Nos. 145054, 175352. Submitted February 20, 1996, at Grand Rapids. Decided July 9, 1996, at 9:00 A.M. Leave to appeal sought.

Arthur Hubbard was convicted by a jury in the Kalamazoo Circuit Court, John F. Foley, J., of assault with intent to commit great bodily harm less than murder, extortion, and two counts of possession of a firearm during the commission of a felony. He appealed. The Court of Appeals, SAWYER, P.J., and GRIFFIN and NEFF, JJ., remanded the case to the trial court for an evidentiary hearing regarding the defendant's claim that the process used to allocate prospective jurors from a master source list to the circuit court venires violated his Sixth Amendment guarantee of an impartial jury drawn from a fair cross section of the community. Unpublished order of the Court of Appeals, entered December 22, 1992 (Docket No. 145054). On remand, the circuit court, Richard R. Lamb, J., found that the defendant established a Sixth Amendment violation and ordered a new trial. The Court of Appeals then granted the prosecution's delayed application for leave to appeal (Docket No. 175352) and consolidated the appeals.

After remand, the Court of Appeals *held*:

1. The method of allocating prospective jurors to the circuit court that was employed at the time of the defendant's trial violated the fair-cross-section requirement of the Sixth Amendment.

2. The defendant's challenge to the method of allocating prospective jurors was timely raised in the trial court and was properly presented to the Court of Appeals for resolution. A Sixth Amendment fair-cross-section challenge need not be submitted to the trial court in writing. A challenge to the jury array is timely if it is made before the jury has been impaneled and sworn. The defendant's challenge, during voir dire and before the panel was sworn, was timely raised.

3. The defendant did not waive his challenge to the jury array by expressing satisfaction with the jury as impaneled. The record demonstrates that the defendant's expression of satisfaction was an exercise in practicality to avoid alienating the jury.

4. The defendant's failure to exhaust his peremptory challenges did not constitute a forfeiture of his fair-cross-section challenge under the facts of this case.

5. A defendant, to establish a violation of the fair-cross-section requirement, must establish that the group alleged to be excluded is a distinctive group in the community, that the representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and that this underrepresentation is attributable to the systematic exclusion of the group in the jury selection process. The defendant satisfied all three prongs of this test. African-Americans are considered a constitutionally cognizable group for Sixth Amendment fair-cross-section purposes, they were substantially underrepresented in the jury pool, and the underrepresentation resulted from a systematic exclusion of significant duration.

6. In ascertaining the level of disparity, the absolute disparity test is an ineffective measure of acceptable disparity where, as here, the constitutionally distinctive group composes a small percentage of the overall community population. Here, the underrepresentation resulted from circumstances less benign than the use of voter registration lists, it resulted from a defect inherent in the juror allocation process employed by the county. The level of disparity here constituted substantial underrepresentation under the Sixth Amendment.

7. This decision has retrospective application only to the extent of direct appeals currently pending, or filed after the issuance date of this decision, where the jury array issue was specifically and seasonably raised in the trial court and properly preserved for appellate review. This decision does not warrant reversal per se of an otherwise valid conviction obtained in the Kalamazoo Circuit Court when the flawed procedure was in use. Each case must be decided on its own merits.

8. The extortion statute, MCL 750.213; MSA 28.410, is not void for vagueness.

9. The prosecution presented sufficient evidence to sustain the conviction of extortion.

10. The trial court properly instructed the jury regarding reasonable doubt.

Reversed and remanded for a new trial.

1. CONSTITUTIONAL LAW — CHALLENGE TO JURY ARRAY — FAIR CROSS SECTION — MOTIONS AND ORDERS — ORAL MOTIONS.

A Sixth Amendment fair-cross-section challenge to a jury array does not have to be submitted to the trial court in writing (US Const, Am VI).

2. TRIAL — MOTIONS AND ORDERS — CHALLENGE TO JURY ARRAY.

A challenge to a jury array is timely if it is made before the jury has been impaneled and sworn.

3. TRIAL — PRESERVING QUESTIONS — CHALLENGE TO JURY ARRAY.

A defendant does not waive a challenge to a jury array by expressing satisfaction with the jury as impaneled after the trial court denies the challenge where the expression of satisfaction is not intended as a relinquishment of the challenge but is an attempt to avoid alienating the jury.

4. APPEAL — PEREMPTORY CHALLENGES — PRESERVING QUESTION.

Appellate courts do not require a party to exercise peremptory challenges in an unintelligent and pointless manner to preserve a challenge to the composition of a jury such as when the exercise would not prevent error, eliminate its prejudice, or further demonstrate the error and its prejudice.

5. CONSTITUTIONAL LAW — JURY — FAIR CROSS SECTION OF COMMUNITY.

A criminal defendant is entitled to a jury drawn from a fair cross section of the community, not a petit jury that mirrors the community and reflects the various distinctive groups in the population; the Sixth Amendment guarantees an opportunity for a representative jury by requiring that jury wheels, pools of names, panels, or venues from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to constitute a fair cross section of the community (US Const, Am VI).

6. CONSTITUTIONAL LAW — JURY — FAIR CROSS SECTION OF COMMUNITY — PRIMA FACIE CASE.

A prima facie showing that a jury was not selected from a fair cross section of the community is made where the defendant shows that the group alleged to be excluded is a distinctive group in the community, the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and the underrepresentation is attributable to systematic exclusion of the group in the jury selection process; African-Americans are a constitutionally cognizable group for purposes of the first requirement; the second requirement is satisfied by a showing that the group is substantially underrepresented in the jury pool; the absolute disparity test is an ineffective measure of acceptable disparity where the group composes a small percentage of the overall community population; a level of

disparity that would be statistically insignificant under the absolute disparity test may constitute substantial underrepresentation where the underrepresentation does not result from benign random selection (US Const, Am VI).

7. EXTORTION — CONSTITUTIONAL LAW — WORDS AND PHRASES — "THREATEN."

A conviction may be secured when a defendant is charged with extortion arising out of the taking of property by threat of harm only upon presentation of proof of the existence of a threat of future harm; a conviction may be secured when the defendant is charged with extortion arising out of a compelled action or omission only upon presentation of proof of the existence of a threat of immediate, continuing, or future harm; the word "threaten" in the extortion statute is not unconstitutionally vague (MCL 750.213; MSA 28.410).

8. EXTORTION — WORDS AND PHRASES — "THREATEN."

The Legislature did not intend to punish every minor threat in enacting the extortion statute; the Legislature intended punishment for those threats that result in pecuniary advantage to the individual making the threat or that result in the victim undertaking an action of serious consequence (MCL 750.213; MSA 28.410).

9. CRIMINAL LAW — REASONABLE DOUBT — JURY INSTRUCTIONS.

A reasonable doubt jury instruction passes appellate review where the reviewing court in reading the instruction in its entirety has no doubt that the jury understood the burden placed upon the prosecutor and what constituted a reasonable doubt; a trial court's failure to include "moral certainty" language in the definition of reasonable doubt is not error requiring reversal.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *James J. Gregart*, Prosecuting Attorney, and *Judith B. Ketchum*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *F. Michael Schuck*), for the defendant on appeal.

AFTER REMAND

Before: MARKEY, P.J., and HOLBROOK, JR., and M. J. MATUZAK,* JJ.

HOLBROOK, JR., J. A Kalamazoo Circuit Court jury convicted defendant of assault with intent to commit great bodily harm less than murder, MCL 750.84; MSA 28.279, extortion, MCL 750.213; MSA 28.410, and two counts of possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Defendant appealed as of right and, in an unpublished order, entered December 22, 1992 (Docket No. 145054), we remanded this matter to the trial court for an evidentiary hearing. The purpose of the hearing was to allow defendant to develop a record with regard to his claim that the process used at the time of his trial to allocate prospective jurors from a master source list to the Kalamazoo Circuit Court venires violated his Sixth Amendment guarantee of an impartial jury drawn from a fair cross section of the community. On remand, the trial court found that defendant established a Sixth Amendment violation and ordered a new trial. The prosecution then filed a delayed application for leave to appeal. We granted leave and consolidated these appeals. We agree with the trial court's grant of a new trial and reverse and remand for a new trial.

I

These appeals require us to address the difficult question whether the circuit court jury that tried and convicted defendant was drawn from a venire that

---

* Circuit judge, sitting on the Court of Appeals by assignment.

unconstitutionally underrepresented the African-American community in Kalamazoo County. After careful consideration of the extensive briefing performed by the parties and the evidence presented at a four-day evidentiary hearing, we conclude that the method of allocating prospective jurors to the Kalamazoo Circuit Court, which was employed at the time of defendant's trial, violated the fair-cross-section requirement of the Sixth Amendment.

A

Before we can reach the merits of the substantive question posed, we must first address several procedural issues raised by the prosecutor. Specifically, the prosecutor advances a series of presentation and preservation arguments in support of her contention that the trial court should not have reached the substantive merits of defendant's fair-cross-section challenge. For the reasons set forth below, we find that defendant's challenge was timely raised below and properly presented to us for resolution.

Initially, the prosecutor contends that the trial court should not have reached the substantive merits of defendant's challenge because defendant's oral motion made during voir dire was insufficient to place the issue before the trial court and preserve the issue for later appellate review. While this Court has ruled that a challenge to a jury array must be filed in writing before the jury is sworn, the decision announcing this rule was subsequently vacated by our Supreme Court. *People v Kelly*, 147 Mich App 806, 814; 384 NW2d 49 (1985), vacated 428 Mich 867 (1987). Moreover, our review of the two cases relied upon by this Court in *Kelly* reveals that neither case

addressed whether a challenge to an array had to be made in writing. See *People v McCrea*, 303 Mich 213; 6 NW2d 489 (1942); *People v Stephen*, 31 Mich App 604; 188 NW2d 105 (1971). Without the assistance of citation to meaningful authority, we decline to adopt a rule that Sixth Amendment fair-cross-section challenges must be submitted to the trial court in writing. *Ward v Frank's Nursery & Crafts, Inc*, 186 Mich App 120, 129; 463 NW2d 442 (1990).

The prosecutor next contends that the trial court was precluded from considering defendant's challenge because defendant's initial motion was untimely. A challenge to the jury array is timely if it is made before the jury has been impaneled and sworn. *McCrea, supra* at 278, citing *People v McArron*, 121 Mich 1, 5; 79 NW 944 (1899), and 35 CJ, p 377. Defendant raised his initial Sixth Amendment challenge during voir dire, before the panel was sworn. We find the challenge to have been timely raised.

Our conclusion that the challenge was timely made is not changed by the prosecutor's reliance on MCL 600.1354(1); MSA 27A.1354(1), which provides in pertinent part:

> Failure to comply with the provisions of this chapter shall not . . . affect the validity of a jury verdict unless the party . . . claiming invalidity has made timely objection and unless the party demonstrates actual prejudice to his cause and unless the noncompliance is substantial. An objection made at the day of a scheduled trial shall not be considered timely unless the objection, with the exercise of reasonable diligence, could not have been made at an earlier time.

The record establishes that the circuit court possessed no data from which defendant could ascertain the minority representation on the source list or in

the venire. Absent such data, defendant could not ascertain whether there was a need to challenge the juror allocation process before defendant actually viewed the array. Accordingly, we decline to disturb the trial court's determination that defendant's challenge could not have been made earlier than during voir dire and that defendant's objection was timely made within the meaning of MCL 600.1354; MSA 27A.1354. *People v Oliphant*, 399 Mich 472, 501; 250 NW2d 443 (1976).

The prosecutor also contends that defendant waived his right to pursue his challenge by expressing satisfaction with the jury as impaneled. An expression of satisfaction with a jury made at the close of voir dire examination waives a party's ability to challenge the composition of the jury thereafter impaneled and sworn. This rule first arose in cases involving challenges to the manner in which voir dire was conducted and continues to be applied in such cases. See, e.g., *People v Rose*, 268 Mich 529, 531; 256 NW 536 (1934); *Snyder v Mathison*, 196 Mich 378, 386; 163 NW 104 (1917); *People v DePlanche*, 183 Mich App 685, 691; 455 NW2d 395 (1990); *People v Acosta*, 16 Mich App 249, 250; 167 NW2d 897 (1969). In *People v Mann*, 49 Mich App 454, 463; 212 NW2d 282 (1973), a case relied heavily upon by the prosecutor, this Court extended this waiver rule, without explanation, to a case wherein the defendant claimed that he was denied due process because the petit jury array may have excluded an allegedly substantial class of the community. We find the prosecutor's reliance on *Mann* to be misplaced.

In *Leslie v Allen-Bradley Co, Inc*, 203 Mich App 490, 493; 513 NW2d 179 (1994), this Court concluded

that a party's expression of satisfaction with the jury on the record before the jury did not constitute a waiver where the record demonstrated that the party was not satisfied with the jury and where the party's expression of satisfaction was "a necessary part of trial strategy, designed to avoid alienating prospective jurors." We find nothing in the trial record to support a conclusion that defendant's expression of satisfaction with the jury was intended as a relinquishment of his belief that the venire was selected in an unconstitutional manner or that such expression was anything more than an exercise in practicality, given the trial court's earlier adverse ruling and the potential for jury alienation. Accordingly, we find that defendant did not waive his fair-cross-section challenge by expressing satisfaction with the jury as impaneled.

Finally, the prosecutor contends that defendant forfeited consideration of his challenge by failing to exhaust his peremptory challenges. Generally, a party must exhaust that party's peremptory challenges to prevent a challenge to the composition of a jury from being deemed forfeited. *Rose, supra* at 531. This rule is usually applied in cases where a party challenges the composition of the jury on the basis of a defect in the voir dire process that allowed a juror or jurors to be seated when juror impartiality is at question. *Id.*; *People v Taylor*, 195 Mich App 57, 59-60; 489 NW2d 99 (1992). To the extent that this rule applies in cases involving Sixth Amendment fair-cross-section challenges, *cf. Mann, supra* at 463, the rule is not absolute in its application. *Taylor, supra* at 60. Appellate courts do not require a party to exercise peremptory challenges in an unintelligent and pointless manner. *Id.* A peremptory challenge is exercised unintelli-

gently and pointlessly when the exercise would not prevent error, eliminate its prejudice, or further demonstrate the error and its prejudice. *Id.*

The record establishes a complete absence of African-Americans in defendant's jury array. Defendant challenged the array on the ground that the juror allocation process employed by Kalamazoo County excluded African-American jurors from the venire and deprived him of his right to a jury drawn from a fair cross section of the community. Under these circumstances, to have required defendant to exhaust his peremptory challenges would have been to require defendant to engage in an unintelligent and pointless exercise of the challenges. Defendant could not have cured any defect in the juror allocation process through the use of additional peremptory challenges. Nor would the use of additional peremptory challenges have increased the number of African-Americans on the jury, given that there were no African-Americans in the array. On this record, defendant's failure to exhaust his peremptory challenges does not constitute a forfeiture of his fair-cross-section challenge.

Having concluded that defendant raised his Sixth Amendment challenge in a timely manner, and that the challenge is properly before us for resolution, we now address the substantive merits of the challenge.

B

We begin our discussion of the substantive question posed with an explanation of the procedures used to allocate prospective jurors from a general source list to the venires of the various Kalamazoo County courts and of the pertinent racial demographics of the

county. We then explore the legal framework within which these facts must be examined.

The Kalamazoo County courts consist of a circuit court and a district court. The district court is divided into two districts—the Eighth and Ninth Districts. The Ninth District Court is further divided into two divisions. Division I covers of the City of Kalamazoo and Division II covers the City of Portage. The Eighth District Court covers the remainder of the county.

Since 1987, Michigan has required that petit juries for these courts be chosen from a source list consisting of the names of county residents at least eighteen years of age drawn from the Secretary of State's driver's license and personal identification cardholder lists. MCL 600.1300; MSA 27A.1300, MCL 600.1301a; MSA 27A.1301(1), MCL 600.1304; MSA 27A.1304. The Kalamazoo Circuit Court jury coordinator secured a source list by submitting a written request to the Secretary of State's office that specified the total number of county residents the courts estimated would be needed for jury service in the upcoming "jury fiscal year." The Secretary of State's office then used a computer program to generate a source list on the basis of the county's specifications. The source list identified the prospective jurors by name, street address, residency of city, state, and county, and zip codes. It did not identify prospective jurors by race.

The jury coordinator provided the list to the Kalamazoo County director of information systems, who, in turn, loaded the list into the county's computer system for the purpose of assigning county residents who held post office box addresses a zip code that corresponded to the boxholders' city and street addresses. After these zip codes were assigned,

the jury coordinator forwarded the list to First Data Resources in Omaha, Nebraska, where "sector segment extensions" were added to the zip codes of each county resident named on the list. A sector segment extension was a four-digit numerical code added to the end of the five-digit zip code to identify an individual by residence location.

Once the list was returned to the county, the jury coordinator decided the number of qualifying questionnaires to be sent for each court on the basis of each court's anticipated need for jurors and past experience concerning the rate of return expected from the questionnaire mailing. These numbers were then supplied to the director of information systems, who reloaded the list into the county's computer system. The zip codes, the sector segment extensions, and sometimes the street addresses were used to determine the court jurisdiction in which each prospective juror resided. The computer then randomly sorted and assigned names from the list to each court up to the maximum number requested. From the mid-1980s until July 1992, the computer allocated prospective jurors first to the Ninth District Court, Division I, then to the Ninth District Court, Division II, then to the Eighth District Court, and finally to the circuit court. Those persons on the list who lacked a sector segment extension were automatically assigned to the circuit court. Defendant's jury was the product of this allocation system.

The juror allocation system employed after July 1992 selected jurors first for the circuit court and then allocated the remaining names to the appropriate district courts. The allocation system was changed after the circuit court learned as a result of

an outside study that by first allocating residents of the City of Kalamazoo to the jury list for the Ninth District Court, Division I, few residents of the City of Kalamazoo remained on the source list and were available for allocation to the circuit court venires. Consequently, residents of the City of Kalamazoo were being significantly underrepresented in the circuit court venires. Moreover, because the largest population of African-Americans eligible for jury service resided in the City of Kalamazoo, the exclusion of residents of the City of Kalamazoo from the circuit court venires resulted in approximately seventy-five percent of the African-American adults eligible for jury service being excluded from service in the circuit court, by one expert's estimation.

Under both allocation systems, questionnaires were mailed to those individuals randomly selected from the source list and allocated to the jury lists of the various county courts. A three-member jury board screened completed and returned questionnaires for juror eligibility and for possible excusals. The board then returned the questionnaires to the jury coordinator, who made entries into the computer indicating whether a prospective juror was qualified for service or excused from service. Excused prospective jurors were purged from the system as were prospective jurors who failed to return the questionnaire or whose questionnaires were returned as undeliverable. The jury coordinator used the lists of qualified prospective jurors to summon county residents for jury duty.

The 1990 census figures indicated that African-American adults residing in Kalamazoo County comprised 7.4 percent of the county's population eighteen

years of age and older. The figures further indicated that African-American adults residing in the City of Kalamazoo comprised 14.77 percent of the city's population eighteen years of age and older. The City of Kalamazoo was the most populous municipal corporation in the county, representing approximately 36 percent of the county's population.

C

The prosecutor contends that the trial court erroneously concluded that the juror allocation process employed at the time of defendant's trial violated defendant's Sixth Amendment right to a jury drawn from a representative cross section of the community and, therefore, abused its discretion in granting defendant's motion for a new trial. We disagree.

This Court reviews a trial court's grant of a motion for a new trial for an abuse of discretion. *People v Herbert*, 444 Mich 466, 477; 511 NW2d 654 (1993). Questions of systematic exclusion of minorities from venires are reviewed de novo by this Court. See, e.g., *McCrea, supra* at 276-277; *People v Sanders*, 58 Mich App 512, 514-516; 228 NW2d 439 (1975).

A criminal defendant is entitled to an impartial jury drawn from a fair cross section of the community. *Taylor v Louisiana*, 419 US 522, 526-531; 95 S Ct 692; 42 L Ed 2d 690 (1975). This fair-cross-section requirement does not entitle the defendant to a petit jury that mirrors the community and reflects the various distinctive groups in the population. *Id.*. at 538. Instead, the Sixth Amendment guarantees an opportunity for a representative jury by requiring that jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically

exclude distinctive groups in the community and thereby fail to constitute a fair cross section of the community. *Id.*; *United States v Jackman*, 46 F3d 1240, 1244 (CA 2, 1995). In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979). Even if a prima facie fair-cross-section violation has been established by the defendant, the government may overcome the right to a proper jury by proffering a significant state interest that manifestly and primarily advances those aspects of the jury selection process that would result in the disproportionate exclusion of a distinctive group, such as exemption criteria. *Id.* at 367-368; *Ford v Seabold*, 841 F2d 677, 681 (CA 6, 1988).

Defendant satisfied the first prong of the *Duren* test. African-Americans are considered a constitutionally cognizable group for Sixth Amendment fair-cross-section purposes. *United States v Ashley*, 54 F3d 311, 313 (CA 7, 1995); *Jackman, supra* at 1246; *Ramseur v Beyer*, 983 F2d 1215, 1230 (CA 3, 1992).

The second prong of the *Duren* test may be satisfied by showing that the number of members of the cognizable group is not fair and reasonable in relation to the number of members in the relevant community. *People v Sanders*, 51 Cal 3d 471, 491-492; 273 Cal Rptr

537; 797 P2d 561 (1990). Explained another way, the second prong is satisfied where it has been shown that a distinctive group is substantially under-represented in the jury pool. *United States v Osorio*, 801 F Supp 966, 977 (D Conn, 1992). Unfortunately, the United States Supreme Court has not yet spoken definitively regarding either the means by which disparity may be measured or the constitutional limit of permissible disparity. *Sanders, supra*, 51 Cal 3d 492-493. Consequently, the courts have developed and applied three separate methods of measuring disparity. These methods include the absolute disparity test, also referred to as the absolute numbers or absolute impact test, *Ashley, supra* at 314; *Jackman, supra* at 1246; *Ramseur, supra* at 1231; *Osorio, supra* at 977-978, the comparative disparity test, *Ramseur, supra*; *Sanders, supra*, 51 Cal 3d 492, n 5, and the deviation from expected random selection test, also referred to as the standard deviation test, *Ramseur, supra*, or the statistical decision theory, *Ford, supra* at 684, n 5. The absolute disparity test is most often applied in Sixth Amendment fair-cross-section cases, *People v Bell*, 49 Cal 3d 502; 527, n 14; 262 Cal Rptr 1; 778 P2d 129 (1989), whereas the comparative disparity and the standard deviation tests are more likely to be applied in equal protection cases, *Castaneda v Partida*, 430 US 482, 492-499; 97 S Ct 1272; 51 L Ed 2d 498 (1977); *Alexander v Louisiana*, 405 US 625, 626-631; 92 S Ct 1221; 31 L Ed 2d 536 (1972); *Ramseur, supra* at 1231-1233; *Ford, supra* at 684, n 5; *Alston v Manson*, 791 F2d 255, 258-259 (CA 2, 1986).

The trial court failed to identify the test it employed to ascertain the level of disparity present in this case. The proper test to be applied under these

facts presents a question of first impression in this state. The prosecutor urges this Court to adopt the absolute disparity test. We decline to do so for the reasons set forth below.

The absolute disparity test measures representativeness by the difference between the percentage of a certain population group eligible for jury duty and the percentage of that group who actually appear in the venire. *Ramseur, supra* at 1231; *Sanders, supra,* 51 Cal 3d 492, n 5. The absolute disparity is obtained by subtracting the jury representation percentage from the community percentage. *Id.* Under this test, absolute disparities between 2 percent and 11.2 percent are considered statistically insignificant and do not constitute substantial underrepresentation. *Ashley, supra* at 314; *Ramseur, supra* at 1231, 1232, n 18; *United States v Tuttle,* 729 F2d 1325, 1327 (CA 11, 1984).

Although the absolute disparity test is widely accepted and applied, *Ashley, supra* at 314; *Ramseur, supra* at 1231; *United States v Biaggi,* 909 F2d 662, 678 (CA 2, 1990); *United States v McAnderson,* 914 F2d 934, 941 (CA 7, 1990); *United States v Test,* 550 F2d 577, 587 (CA 10, 1976), the test is not without its critics. In *Biaggi, supra* at 678, the United States Court of Appeals for the Second Circuit criticized the test as follows:

> The risk of using this approach is that it may too readily tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing. Of course, the Sixth Amendment assures only the *opportunity* for a representative jury, rather than a repre-

sentative jury itself, . . . but that opportunity can be imper-
iled if venires regularly lack even the small numbers of
minorities necessary to reflect their proportion of the popu-
lation. [Emphasis in original.]

See also *Jackman, supra* at 1246-1247; *State v Wil-
liams*, 525 NW2d 538, 543 (Minn, 1994); *Osorio, supra*
at 978-979. The deficiency inherent in this test
becomes more acute where there is a small percent-
age of minorities of voting age eligible for jury ser-
vice. *Jackman, supra* at 1247.

Turning now to the case before us, adult African-
Americans composed 7.4 percent of the Kalamazoo
County population. They also comprised 3.3 percent
to 4 percent of the Kalamazoo Circuit Court venires
between July 10, 1990, and July 9, 1991, based on sta-
tistical estimates. Using these figures, the absolute
disparity in this case was 3.4 percent (7.4 percent
minus 4 percent) to 4.1 percent (7.4 percent minus 3.3
percent). An absolute disparity falling in this range
does not constitute substantial underrepresentation
for Sixth Amendment fair-cross-section purposes.
*Ramseur, supra* at 1232 & n 18; *Osorio, supra* at 978;
*Biaggi, supra* at 677-678.

We believe, however, that this case demonstrates
the danger of employing the absolute disparity test
when the distinctive group constitutes a small per-
centage of the voting-age adults who are presump-
tively available and qualified to serve as jurors. Had
the juror allocation process employed in Kalamazoo
County excluded all 7.4 percent of the African-
Americans in the adult county population, the abso-
lute disparity would have risen to 7.4 percent (7.4 per-
cent minus 0 percent). An absolute disparity of 7.4
percent also fails to constitute substantial under-

representation under the case law. Thus, the Kalamazoo County juror allocation system could have excluded all African-Americans from jury service and a successful Sixth Amendment challenge would not be possible because the total percentage of African-American adults in the county population constituted a percentage less than that which was considered statistically significant for Sixth Amendment analysis. Under these circumstances, we conclude that the absolute disparity test is an ineffective measure of acceptable disparity when the constitutionally distinctive group composes a small percentage of the overall community population. We decline, therefore, to find the absolute disparity test controlling in this case. Instead, we believe the better approach to take under these circumstances is the approach taken in *Osorio, supra.*

In *Osorio, supra* at 968, 972, the defendant claimed that the method of selecting his grand jurors in the Hartford Division of the United States District Court for the District of Connecticut violated the Sixth Amendment requirement of a fair cross section where the residents of the two largest cities in the division, Hartford and New Britain, were absent from the qualified jury wheel and where these two cities combined to account for 62.93 percent of the voting-age African-American population and 68.09 percent of the voting-age Hispanic population in the division. The absence of residents of the City of New Britain from the qualified wheel resulted from the failure to enter any of the names of the city's residents into the master wheel, from which the qualified wheel was drawn. *Id.* at 972. The absence of residents of the City of Hart-

ford resulted from some unexplained cause and was not attributable to random chance. *Id.* at 972-973.

The court applied the absolute disparity test when it evaluated whether the defendant had satisfied the second prong of the *Duren* test by showing that African-Americans and Hispanics were substantially underrepresented in the qualified wheel. *Osorio*, *supra* at 977, 978. The absolute disparity for African-Americans was 3.26 percent. The absolute disparity for Hispanics was 4.3 percent. *Id.* at 978. The court noted that these absolute disparity percentages demonstrated insubstantial underrepresentation for Sixth Amendment purposes, citing *Biaggi*, *supra* at 678-679. *Osorio*, *supra* at 978. The court refused, however, to find *Biaggi* controlling. Instead, after reiterating *Biaggi*'s warning regarding the deficiencies of the absolute disparity test, the court found that the defendant had shown substantial underrepresentation within the meaning of a Sixth Amendment analysis where the disparity resulted from "non-benign" circumstances:

> More importantly, the Second Circuit recognized that the degree of underrepresentation experienced in *Biaggi* "press[ed] the [*United States* v] *Jenkins* [496 F2d 57 (CA 2, 1974)] 'absolute numbers' approach to its limit" and stated that it "would find the Sixth Amendment issue extremely close *if the underrepresentations had resulted from any circumstance less benign than use of voter registration lists."* [*Biaggi*, *supra*] at 679 (emphasis added).
>
> The facts herein reveal circumstances far less benign than the use of voter registration lists. *Biaggi* was not faced with a situation where roughly one-third (27 of 84) of the towns within the division were not represented on the Qualified Wheel. Furthermore, *Biaggi* did not see the total exclusion from the Qualified Wheel of the two largest cities in the Division, cities accounting for one-sixth of the total

population and two-thirds of the minority population in the Division. Finally, this case illustrates the problem in applying the "absolute numbers" approach followed in *Biaggi*. Given the small percentage of voting-age blacks and Hispanics residing within the Hartford Division (6.34% and 5.07 % respectively as compared to 19.9% and 15.7% within the Manhattan Master Wheel of the Southern District of New York in *Biaggi*), the absence of a representative sample of blacks and Hispanics in the Qualified Wheel leads to the "unacceptable probability" that the minority members of the jury ultimately selected will be markedly deficient in number and, in most cases, totally missing. *See [Biaggi, supra]* at 678.

. . . The underrepresentation of blacks and Hispanics was held to be "benign" in *Biaggi* because there was no evidence that any circumstances other than random selection of names from the voter registration lists created that underrepresentation. 909 F2d at 678. In contrast, the exclusion of Hartford and New Britain from the Qualified Wheel, an occurrence not the result of random chance, is not "benign" as that term is understood by the Court. . . .

The lack of random selection in the compilation of names for the Qualified Wheel is what makes the circumstances here less benign than in *Biaggi*. Accordingly, as *Biaggi*'s holding does not control in this case and as circumstances less benign than voter registration lists have led to minority underrepresentation in the Qualified Wheel, the Court finds that, on the facts in this case, a racial disparity requiring the addition of two blacks and two Hispanics to an average grand jury venire constitutes substantial underrepresentation under the Sixth Amendment. [*Osorio, supra* at 978-979.]

*See also Jackman, supra* at 1246-1248 (employing an approach similar to that taken in *Osorio* to determine that substantial underrepresentation existed for Sixth Amendment purposes in the jury selection process implemented in light of *Osorio*).

The level of absolute disparity in this case is similar to that found in *Osorio*. This case is also similar to *Osorio* in that the underrepresentation of African-Americans in the venires was the result of circumstances less benign than random selection from voter registration lists. The evidence produced on remand reveals that the juror allocation process employed by Kalamazoo County before July 1992—and not random selection—caused the underrepresentation.

Between 1984 or 1985 and July 1992, the juror allocation process employed in Kalamazoo County first allocated residents of the City of Kalamazoo to the jury list for the Ninth District Court, Division I. Once the jury list for this court was filled, those residents of the City of Kalamazoo not allocated to this district court jury list were then made available for allocation to the circuit court jury list. By giving the Ninth District Court, Division I, priority over the circuit court, the allocation process guaranteed that the number of residents of the City of Kalamazoo available for allocation to the circuit court jury list was significantly less than the city's approximate thirty-six percent representation in the county's general population. The level of underrepresentation is reflected in the figures entered into evidence that indicate that residents of the City of Kalamazoo regularly comprised between two percent and seventeen percent of the prospective jurors made available for circuit court jury service. Moreover, the largest population of African-Americans residing in the county reside in the City of Kalamazoo. Consequently, by guaranteeing that residents of the City of Kalamazoo would be substantially underrepresented in the circuit court venires, the allocation system guaranteed that African-

Americans residing in the City of Kalamazoo likewise would be underrepresented. In fact, there was evidence introduced that indicated that the substantial exclusion of residents of the City of Kalamazoo from the circuit court venires resulted in the exclusion of approximately seventy-five percent of the African-American adults eligible for jury service in the circuit court.

On this record, we conclude that the underrepresentation of African-Americans in the circuit court venires prevalent at the time of defendant's jury selection did not result from "benign" random selection, but, instead, resulted from a defect inherent in the juror allocation process employed by Kalamazoo County. Moreover, given the lack of benign causation, we conclude that the level of disparity constituted substantial underrepresentation under the Sixth Amendment. *Osorio, supra* at 978-979. Defendant has satisfied the second prong of the *Duren* test.

The third prong of the *Duren* test is satisfied by showing that the underrepresentation of a distinctive group is due to systematic exclusion, i.e., an exclusion resulting from some circumstance inherent in the particular jury selection process used. *Duren, supra* at 366; *Ashley, supra* at 314. A systematic exclusion is not shown by one or two incidents of a venire being disproportionate. *Ford, supra* at 685; *Timmel v Phillips*, 799 F2d 1083, 1087 (CA 5, 1986); see also *Duren, supra* at 366 (a large discrepancy occurring in every weekly venire for a period of nearly a year manifestly indicates that the cause was systematic).

The evidentiary record before us establishes that the juror allocation system employed by Kalamazoo County before July 1992 was the primary cause of the

underrepresentation of African-Americans in the circuit court venires. The county employed this allocation system between the mid-1980s and mid-1992. A statistical analysis of the racial composition of the jury arrays for a forty-nine-week period beginning in July 1990 and ending in July 1991 indicated that African-Americans were significantly underrepresented in the venires during this period. Additionally, we can infer from testimonial evidence offered that this underrepresentation of African-Americans also was present in 1989.

We conclude, on this record, that defendant established that the underrepresentation of African-Americans resulted from a systematic exclusion of significant duration and, therefore, that defendant satisfied the third prong of the *Duren* test.

The trial court correctly determined that defendant had been deprived of his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community. Accordingly, the trial court did not abuse its discretion in granting defendant's motion for a new trial. We affirm the trial court's findings on remand and reverse and remand for a new trial.

D

Having concluded that the Kalamazoo County jury array procedure was systemically flawed between the mid-1980s and 1992, we further conclude that this decision shall have retrospective application only to the extent of direct appeals currently pending, or filed after the issuance date of this decision, where the jury array issue was specifically and seasonably raised in the trial court and properly preserved for appellate review. See *Daniel v Louisiana*, 420 US 31,

32-33; 95 S Ct 704; 42 L Ed 2d 790 (1975); *Teague v Lane*, 489 US 288; 109 S Ct 1060; 103 L Ed 2d 334 (1989). We further caution the bench and bar, however, that this decision should not be interpreted as warranting reversal per se of an otherwise valid conviction obtained in the Kalamazoo Circuit Court during the time when the flawed jury array procedure was in use. Each case must be decided on its own merits. See, e.g., *People v Dixon*, 217 Mich App 400; 552 NW2d 663 (1996) (challenge to jury array procedure was untimely and therefore appellate review was forfeited).

II

Because of the dispositive nature of our resolution of the Sixth Amendment challenge, we limit our remaining discussion to those claims properly preserved and presented to this Court for resolution and necessary to guide the trial court and the parties on retrial.

Defendant contends that the extortion statute, MCL 750.213; MSA 28.410, is void for vagueness. Defendant's failure to challenge the constitutionality of this statute before the trial court normally would preclude appellate review. *People v Gezelman (On Rehearing)*, 202 Mich App 172, 174; 507 NW2d 744 (1993). We waive the preservation requirement, however, because defendant raises an important constitutional issue of first impression. *Id.*

A statute challenged on a constitutional basis is clothed in a presumption of constitutionality. *Johnson v Harnischfeger Corp*, 414 Mich 102, 112; 323 NW2d 912 (1982). Further, a court is obligated to construe a statute as constitutional unless its unconstitutionality

is clearly apparent. *Thompson v Merritt*, 192 Mich App 412, 424; 481 NW2d 735 (1991).

A statute may be challenged for vagueness on three grounds: (1) it does not provide fair notice of the conduct proscribed; (2) it confers on the trier of fact unstructured and unlimited discretion to determine whether an offense has been committed; and (3) its coverage is overly broad and impinges on First Amendment freedoms. *People v White*, 212 Mich App 298, 309; 536 NW2d 876 (1995). When making a vagueness determination, a court must take into consideration any judicial constructions of the statute. *People v Lino*, 447 Mich 567, 575; 527 NW2d 434 (1994). We review de novo a challenge to a statute's constitutionality under the void-for-vagueness doctrine. See, e.g., *White, supra* at 308-313.

The extortion statute provides in pertinent part:

> Any person who shall . . . orally . . . maliciously threaten any injury to the person . . . of another . . . with intent to compel the person so threatened to do or refrain from doing any act against his will, shall be guilty of a felony. [MCL 750.213; MSA 28.410.]

Defendant premises his void-for-vagueness challenge on a belief that the statute's use of the word "threaten" confers unstructured and unlimited discretion on the trier of fact to determine whether an offense has been committed. We reject defendant's premise and conclude that the statute does not suffer from constitutional infirmity.

Defendant argues that the word "threaten" as used in the statute is unconstitutionally vague unless the word is construed to encompass only threats of future harm. We fail to understand how excluding

threats of present harm from the definition of the term in question renders the statute free of the alleged constitutional defect. Nevertheless, we reject defendant's construction. When a defendant is charged with extortion arising out of the taking of property by threat of harm, a conviction may be secured only upon the presentation of proof of the existence of a threat of future harm. *People v Krist*, 97 Mich App 669, 670-676; 296 NW2d 139 (1980). When the charge is one of extortion arising out of a compelled action or omission, however, a conviction may be secured upon the presentation of proof of the existence of a threat of immediate, continuing, or future harm. *People v Fobb*, 145 Mich App 786, 788-790; 378 NW2d 600 (1985).

We find the word "threaten" as used in the statute to be sufficiently specific to ensure that the statute's enforcement will not be arbitrary or discriminatory, given the prior constructions afforded the term by this Court. *In re Forfeiture of 719 N Main*, 175 Mich App 107, 112-113; 437 NW2d 332 (1989).

Defendant also argues that the extortion statute is unconstitutionally vague because the statute allows a defendant to be convicted of extortion after making a minor threat that results in the victim engaging in an action with no serious consequences to the victim. Defendant urges this Court to construe the statute to allow conviction only when the threat was made to obtain a substantial benefit for the person making the threat. Once again, we reject defendant's construction of the statute.

The Legislature did not intend punishment for every minor threat. *Fobb, supra* at 791. Instead, the Legislature intended punishment for those threats

that result in pecuniary advantage to the individual making the threat or that result in the victim undertaking an action of serious consequence, such as refusing to report a defendant's sexual misconduct or refusing to testify. *Id.* at 792-793. Accordingly, a conviction for extortion will not be sustained where the act required of the victim was minor with no serious consequences to the victim. *Id.* at 791.

We conclude that the construction afforded the statute by *Fobb* provides sufficient guidance regarding the nature of the threat and act compelled to ensure that the statute will not be enforced arbitrarily or discriminatorily. The statute is not void for vagueness.

In the alternative, defendant contends that, if the extortion statute is constitutional, then the prosecutor failed to present sufficient evidence to sustain defendant's conviction for extortion. We disagree. Because defendant's extortion charge arose from a threat made to compel action, a threat of future harm need not have been shown; the existence of a threat of immediate harm was sufficient. *Id.* at 790. Moreover, having reviewed the evidence in a light most favorable to the prosecutor, we conclude that a rational trier of fact could find beyond a reasonable doubt that defendant demanded that the victim undertake an act of serious consequence. *People v Vaughn*, 200 Mich App 32, 35; 504 NW2d 2 (1993).

III

Defendant also contends that the reasonable doubt instruction given by the trial court was fatally flawed because the instruction did not adequately convey to the jury the concept of reasonable doubt. We disagree.

To pass scrutiny, a reasonable doubt instruction, when read in its entirety, must leave no doubt in the mind of the reviewing court that the jury understood the burden that was placed upon the prosecutor and what constituted a reasonable doubt. *People v Jackson*, 167 Mich App 388, 391; 421 NW2d 697 (1988). We review de novo a claim of instructional error. See, e.g., *People v Sammons*, 191 Mich App 351, 372; 478 NW2d 901 (1991); *Jackson, supra* at 390-392.

Over defendant's objection, the trial court charged the jury using the reasonable doubt instruction found in the standard criminal jury instructions. CJI2d 3.2(3). Defendant argues that this instruction was fatally flawed, in part, because the instruction failed to impress upon the jury that guilt has to be so certain that it is as strong as a moral certainty. The failure to include "moral certainty" language in the definition of reasonable doubt does not give rise to error warranting reversal. *Sammons, supra* at 372; *Jackson, supra* at 390-391.

Defendant also argues that the reasonable doubt instruction was fatally flawed because it failed to convey to the jury that a reasonable doubt could arise on the basis of the unsatisfactory nature of the evidence. Defendant relies on *People v Davies*, 34 Mich App 19; 190 NW2d 694 (1971). The instructional error in *Davies* was instructing the jury that a reasonable doubt could not be based upon a lack of evidence or upon the unsatisfactory nature of the evidence. *Id.* at 26-27. No such instruction was given in the instant case. Moreover, we conclude, after reading the instructions in their entirety, that the trial court adequately conveyed to the jury that a reasonable doubt

can arise because of the unsatisfactory nature of the evidence.

Taken as a whole, the instruction given conveyed to the jury that a reasonable doubt is an honest belief based upon reason. *Jackson, supra* at 391. Moreover, the instruction did not have the effect of shifting the burden of proof by requiring the jurors to have a reason to doubt defendant's guilt, particularly given that the trial court repeatedly instructed the jury that the prosecutor bore the burden of proof. *Id.* Rather, it required the jurors to have a reason to doubt defendant's innocence.

When the instructions are read in their entirety, we do not doubt that the jury understood the prosecutor's burden and what constituted a reasonable doubt. Accordingly, we conclude that no instructional error occurred.

IV

We need not consider defendant's remaining issues because those issues either were not preserved for appellate review or were unique to the trial.

Reversed and remanded for a new trial. We do not retain jurisdiction.