RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0171p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

FRANK NALI,
  *Petitioner-Appellee/Cross-Appellant,*

   *v.*

THOMAS PHILLIPS, Warden,
  *Respondent-Appellant/Cross-Appellee.*

Nos. 09-1876/1960

Appeals from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:07-cv-15487—Arthur J. Tarnow, District Judge.

Argued: April 19, 2012

Decided and Filed: June 6, 2012

Before: MOORE, GIBBONS, and ALARCÓN, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Laura Graves Moody, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant/Cross-Appellee. Ryan T. Holte, JONES DAY, Atlanta, GA, for Appellee/Cross-Appellant. **ON BRIEF:** Laura A. Cook, Joel D. McGormley, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant/Cross-Appellee. Ryan T. Holte, JONES DAY, Atlanta, Georgia, Joan Ellerbusch Morgan, Sylvan Lake, Michigan, for Appellee/Cross-Appellant. Frank Nali, Grosse Pointe, Michigan, pro se.

_____

## OPINION

_____

[*] The Honorable Arthur L. Alarcón, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

ALARCÓN, Senior Circuit Judge.  Frank Nali was convicted by a jury in a Michigan state court on one count of extortion in violation of section 750.213 of the Michigan Compiled Laws.  The Michigan courts affirmed his conviction and denied his request for post-conviction relief.  Nali petitioned the United States District Court for the Eastern District of Michigan for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a).  The district court granted unconditionally Nali's petition for a writ of habeas corpus on the ground that the evidence at trial was insufficient to support his conviction, but denied his claim that he was provided with ineffective assistance of trial counsel.  The State of Michigan appeals from the judgment granting Nali's habeas corpus petition on the ground that the evidence presented at trial was sufficient to support Nali's conviction under *Jackson v. Virginia*, 443 U.S. 307 (1979).  Nali cross-appeals from the district court's decision to deny him habeas corpus relief on his ineffective assistance of trial counsel claim.  We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.  For the reasons that follow, we reverse the judgment of the district court on appeal, affirm the judgment on cross-appeal, and remand the matter for further proceedings consistent with this decision.

**I**

**A**

Frank Nali and Mary O'Brien met in 1992 and started a sexual relationship.  O'Brien was married at the time.  Over the course of their relationship, which lasted for approximately ten years, Nali videotaped his sexual encounters with O'Brien without her consent.  O'Brien testified that Nali suggested to her that they videotape their sexual encounters.  O'Brien told Nali that she did not feel comfortable being videotaped because "if there was a videotape that got into the wrong hands, it would be devastating to [her] and [her] family."  Nali told O'Brien he would use the video camera simply to project their sexual acts on the television screen, without recording their conduct.  She testified that Nali told her that there was no film in the camera, and on some occasions "he would actually open the side of the camera and show [her] there was no film [inside

the camera]." O'Brien agreed to projecting the images onto the television screen but not to being taped.

About three years into the relationship, O'Brien found some video cassettes on Nali's dresser that had women's names on them. One of them was labeled "Mary." She confronted Nali about the tape and he admitted it was a videotape of them engaged in sexual acts. O'Brien testified that she told Nali she did not want to be taped; he told her he wanted it for "a souvenir." O'Brien told Nali, "no, I'm going to take it home and I am going to destroy it," but Nali "wrestled it out of [her] hand." When O'Brien declined to watch the video with Nali, he "opened up the videotape and pulled out some of the tape and threw it down"; O'Brien "picked it up and . . . pulled out more tape and threw it down," assuming it was destroyed.

Over the course of the affair, O'Brien attempted on more than one occasion to end her relationship with Nali. Each time, Nali threatened to reveal the affair and the videotapes to her husband. He also threatened to provide the videotapes to the media.

After O'Brien and her husband divorced, she ended her relationship with Nali on September 5, 2002. Nali refused to comply with O'Brien's subsequent requests to be left alone. Instead, he left seventeen voice mail messages on O'Brien's home and work phone numbers between September 6, 2002, and September 12, 2002.

O'Brien recorded the messages on a cassette and gave them to the police. When the police questioned Nali about the telephone messages, he denied calling O'Brien. Later that day, O'Brien's ex-husband intercepted a package addressed to their daughter, which contained a letter and a videotape of some of Nali's sexually explicit encounters with O'Brien.

Two of O'Brien's brothers received similar packages containing sexually explicit videotapes of O'Brien's encounters with Nali and similarly worded letters.

**B**

A jury convicted Nali on one count of extortion. The trial court sentenced Nali to serve a minimum of thirteen years and a maximum of twenty years. This sentence was subsequently reduced by a successor trial court judge to a term of fifty months to twenty years. Nali filed a direct appeal from the judgment of conviction. The State cross-appealed from the order amending the sentence.

While his direct appeal was pending in the Michigan Court of Appeals, Nali filed a *pro se* motion to remand the matter to the trial court so that it could fully develop the factual record to support an ineffective assistance of trial counsel claim. In the remand motion, Nali set forth twenty- eight separate contentions to support his claim that he was denied the effective assistance of counsel at trial. The Michigan Court of Appeals denied Nali's motion "for [petitioner's] failure to persuade the Court of the need to remand" the case at that time.

In his direct appeal, Nali contended that the evidence was insufficient to prove extortion. He also argued that the trial court abused its discretion in denying Nali's request for the appointment of a substitute counsel, his motion for a new trial grounded on his claim of ineffective assistance of trial counsel, and his motion "for evidentiary hearing to establish more fully a record for appellate review . . . in connection with his motion for a new trial."

On December 29, 2005, the Michigan Court of Appeals affirmed the direct appeal of the state court's judgment. It rejected Nali's argument that the trial court abused its discretion in denying his motion for a directed verdict on the extortion charge. Nali filed an application with the Michigan Supreme Court seeking review of the decision of the Michigan Court of Appeals. In his application, Nali raised twelve claims, including his contentions that the evidence was insufficient to support his conviction for extortion and that he was denied the effective assistance of trial counsel. The Supreme Court of Michigan denied Nali's application because it was "not persuaded that the questions presented [by petitioner] should be reviewed" by the court.

In his application for a writ of habeas corpus pursuant to § 2254(a), Nali raised two claims relevant to this appeal.  First, he argued that the Michigan Court of Appeals unreasonably applied federal law as established in *Jackson* in concluding that there was sufficient evidence presented at trial to support his conviction for the crime of extortion under Michigan law.  Second, Nali contended that the Michigan Court of Appeals erred in rejecting his claim that he was denied his Sixth Amendment right to the effective assistance of trial counsel.[1]  The district court found that the evidence at trial was insufficient to support Nali's conviction and granted his petition for an unconditional writ of habeas corpus.  The district court also concluded that Nali was not denied the effective assistance of counsel at trial.  On July 8, 2009, it issued an order granting Nali immediate release.  This timely appeal followed.

## II

### A

The State contends that the district court erred in granting Nali's § 2254(a) petition.  It argues that sufficient evidence was presented at trial to support the jury's finding that Nali maliciously threatened to expose O'Brien's sexual relationship with him to her family in the voice mails he left for her with the intent to compel her not to end it.  This Court reviews de novo a district court's decision to grant or deny a petition for a writ of habeas corpus.  *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006).  We are bound by the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996 in this case because Nali filed his petition on December 7, 2007, after AEDPA's effective date.  *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003) (suits filed after April 24, 1996, AEDPA's effective date, are subject to the amendments made to chapter 153 of Title 28 of the United States Code by AEDPA).  "Under AEDPA, a federal court may grant a writ of habeas corpus with respect to a 'claim that was adjudicated on the merits in State court proceedings' only if the state-court decision 'was contrary to, or

---

[1]The district court appointed counsel for Nali but denied his request for an evidentiary hearing on the sufficiency of the evidence claim.  Instead, the district court *sua sponte* conducted an evidentiary hearing to determine whether Nali's counsel provided effective assistance at trial.

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Pinchon v. Myers*, 615 F.3d 631, 638-39 (6th Cir. 2010) (quoting 28 U.S.C. § 2254(d)(1) and (2)), *cert. denied*, 131 S. Ct. 2151 (2011).

"A state-court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent." *Joseph*, 469 F.3d at 449-50 (brackets, citation, and internal quotation marks omitted). On the other hand, a state-court decision involves an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000), or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context," *Joseph*, 469 F.3d at 450 (citation and internal quotation marks omitted). A state court decision will involve an "unreasonable application" of clearly established federal law, however, only if the state court's decision was "objectively unreasonable," and not merely incorrect. *Williams*, 529 U.S. at 409-10 (internal quotation marks omitted).

AEDPA's deferential standard of review "applies only to any claim that was adjudicated on the merits in [s]tate court proceedings." *Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007) (citation and internal quotation marks omitted), *cert. denied*, 552 U.S. 1118 (2008). Therefore, our analysis under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, — U.S. — 131 S. Ct. 1388, 1398 (2011).

The Supreme Court held in *Jackson* that in determining whether the evidence was sufficient, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. Pursuant to *Pinholster*, we must decide whether the Michigan Court of Appeals' decision that the evidence presented at trial was sufficient to support Nali's conviction on the charge of extortion was contrary to the Supreme Court's decision in *Jackson*. *Pinholster*, 131 S. Ct. at 1398; *see also Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007) ("Under *Jackson*, habeas corpus relief is appropriate based on insufficient evidence only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

This standard requires deference to the jury's verdict and to the state court's review of that verdict. *Jackson*, 443 U.S. at 319; *Pinholster*, 131 S. Ct. at 1398. "But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Jackson*, 443 U.S. at 318-19 (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)). A reviewing court "do[es] not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Johnson v. Mitchell*, 585 F.3d 923, 931 (6th Cir. 2009) (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)). "The inquiry ends if we determine that there was sufficient evidence to convict . . . ." *Pinchon*, 615 F.3d at 643.

**1**

The Michigan Court of Appeals rejected Nali's argument that the trial court abused its discretion when it denied his motion for a directed verdict on the extortion charge. It held as follows:

> In reviewing a trial court's decision on a motion for a directed verdict, "this Court considers the evidence presented in the light most favorable to the prosecution to determine whether a rational factfinder could find that the essential elements of the charged crimes were proven beyond a reasonable doubt." *People v. Davis*, 216 Mich. App. 47, 52-53 (1996). The sufficiency of the evidence is similarly evaluated by reviewing the evidence in a light most favorable to the prosecution to determine if a rational trier of fact could find every element of the crime proven beyond

a reasonable doubt. *People v. Petrella*, 424 Mich. 221, 268-70 (1985). The resolution of credibility disputes is within the exclusive province of the trier of fact, which is entitled to draw reasonable inferences from the evidence. *People v. Reddick*, 187 Mich. App. 547, 551 (1991); *People v. Vaughn*, 186 Mich. App. 376, 380 (1990).

MCL 750.213 provides, in pertinent part:

Any person who . . . shall orally or by any written or printed communication maliciously threaten any injury to the person . . . of another . . . with intent to compel the person so threatened to do or refrain from doing any act against his will, shall be guilty of a felony[.]

In enacting this statute, "[t]he Legislat[ure] did not intend punishment for every minor threat." *People v. Fobb*, 145 Mich. App. 786, (1985); *see also People v. Hubbard* (After Remand), 217 Mich. App. 459, 485 (1996). Rather, the act that the defendant seeks to compel the victim to do (or not do) must not be minor or without consequence. *Fobb*, *supra* at 791-93. Although the threat must be intelligible, *People v. Atcher*, 65 Mich. App. 734, 738 (1975), no overt act is required, *People v. Bruno*, 30 Mich. App. 375, 383 (1971). Whether a threat was actually implied or intended by the defendant is a question of fact for the jury. *People v. Percin*, 330 Mich. 94, 99 (1951).

Contrary to what defendant asserts, the plain language of MCL 750.213 does not require a showing that the victim was actually coerced or intimidated by the defendant's threats to undertake an action of serious consequence. Where a statute is clear and unambiguous, it must be enforced as written. *People v. McIntire*, 461 Mich. 147, 153 (1999). We do not read *Hubbard* as holding otherwise. On the contrary, this Court in *Hubbard* held that there was sufficient evidence to support the defendant's extortion conviction where a rational trier of fact could find that the defendant "*demanded* that the victim undertake an act of serious consequence." *Hubbard*, *supra* at 486. Further, in *Percin*, *supra* at 99, our Supreme Court stated that "[t]he Legislature did not make commission of the offense dependent upon the state of mind of the person threatened, and there is no occasion for reading into the statute qualifications not there found" (citations omitted). The Court further stated that "[i]f the Legislature had "intended that to constitute the offence the person threatened was intimidated . . . it is the rational inference that it would have so declared." *Id*. at 99-100 (citations omitted). Thus, a requirement that the victim actually accede to the extortionist's demands may not be implied into the statute.

In the present case, the evidence indicated that when the victim had attempted to break up with defendant in the past, he threatened to

expose their affair, including revealing letters and videotapes to her family, if she did not continue with the relationship. On September 5, 2002, the victim finally broke off her ten-year relationship with defendant. Between September 6 and 12, 2002, defendant left 17 telephone messages with the victim indicating that there would be consequences to her conduct, that she deserved to be punished, and that he would be the person to do it. On September 12, 2002, the victim went to the police. An officer called defendant, who denied having called the victim. The following day, a video tape depicting defendant and the victim together appeared at her ex-husband's home, addressed to the victim's daughter. Two additional videotapes followed, addressed to two of the victim's brothers.

Viewed in a light most favorable to the prosecution, the evidence was sufficient to enable a reasonable jury to find beyond a reasonable doubt that defendant maliciously threatened to injure the victim with the intent to compel her not to break up with him. Therefore, defendant was properly convicted of extortion, and the trial court did not err in denying defendant's motion for a directed verdict.

*People v. Nali*, No. 247843, 260267, 2005 WL 3556110, at *1-2 (Mich. Ct. App. Dec. 29, 2005) (per curiam) (third alteration added). We note that, while the Michigan Court of Appeals only cited decisions of its own court and of the Michigan Supreme Court, it applied the standard set forth in *Jackson* for reviewing the sufficiency of the evidence.

**2**

The elements of the crime of extortion are set forth in Mich. Comp. Laws § 750.213.

Section 750.213 reads as follows:

Any person who shall, either orally or by written or printed communication, maliciously threaten to accuse another of any crime or offense, or shall orally or by any written or printed communication maliciously threaten any injury to the person or property or mother, father, husband, wife or child of another with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to so or refrain from doing any act against his will, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 20 years or by a fine of not more than 10,000 dollars.

The amended information alleged that Nali committed the crime of extortion through incidents alleged to have occurred between September 6, 2002 and September 19, 2002. (R 15-5, State Ct. Trial Tr., 02/25/03, 120-22.) Nali contends that the prosecution failed to prove that he communicated a threat to O'Brien on or about these dates. He argues that the only evidence that he made a threat to expose his relationship with O'Brien and mail tapes of their sexual encounters was made "a full 2 ½ years prior to the alleged charged offense." Pet'r. Br. 7/9/2010, at 16. The prosecution maintains that a rational jury could infer from the statements Nali made in the seventeen voice mails he recorded to O'Brien from September 6, 2002 to September 12, 2002, that he renewed the extortionate threats he made over the course of their relationship.

Whether a threat has been communicated is a question for the jury. *See People v. Watson*, 11 N.W.2d 926, 928 (Mich. 1943) (holding that it is a "question for the jury to determine whether from the letters and actions of defendant she did maliciously threaten to accuse [the complainant] of a crime with the intent to extort money from him"); *see also People v. Percin*, 47 N.W.2d 29, 31 (Mich. 1951) (holding that "whether the necessary intent was shown [to prove that a threat was made is] a question to be decided by the jury from the facts before them"); *People v. Braman*, 30 Mich. 460, 463 (1874) ("If the meaning of the communication were doubtful, the intent would be a question for the jury.").

O'Brien testified that in April 2000, she "approached [Nali and] . . . told him [she] wanted to go back to [her] family." (R 15-6, State Ct. Trial Tr., 02/26/03, 67.) "[A] couple of days later [Nali] called [O'Brien] and asked [her] to come over . . . [because he had] some information that [he] want[ed] to talk to [her] about." (*Id*. at 67:9-13.) O'Brien testified that Nali met her "at the back door and he took [her] arm and he said, I don't want you to say anything. From now on I'm taking control of this relationship." (*Id*. at 67:20-25.) Nali accused her of seeing someone else while he was away and of lying. (*Id.*) When O'Brien denied the accusations and got up to leave, Nali again told her that he knew "just what to do." (*Id*. at 68:3-12.) She asked Nali if he was going to call her husband and show him their videotapes and letters. Nali replied, "Oh,

yes, don't you worry. I have it all. It will be all over the TV, radio and newspapers. You can't believe how far reaching this will be." (*Id*. at 68:3-10.) O'Brien told Nali he was "threatening" her and it was "blackmail." (*Id*. at 68:11-12.) Nali told her, "you can call it whatever you like." (*Id*. at 68:12-13.) O'Brien continued with the relationship. (*Id*. at 76:24-77:8.)

The record shows, however, that Nali threatened O'Brien with exposing their sexual relationship to her family on several other occasions. For example, O'Brien testified that she tried to leave the relationship a few times during 1996 and 1997 but when she did so, Nali "would threaten [her] again with call[ing her husband] Jim and . . . exposing [their] relationship to him." (*Id*. at 29:20-30:7.) On two of those occasions Nali "actually did make a phone call to [her] home and left a message on [her family's] voicemail." (*Id*. at 30:8-10.) She "ran home and erased [the messages] before anybody heard them." (*Id*. at 30:12.)

Similarly, in March 2002, when O'Brien was going through divorce mediation with her husband, Nali became upset with her for lying about something and "he threaten[ed] to make the phone call again to Jim and expose [their] relationship." (*Id*. at 34:12-21.)

The evidence, therefore, does not support Nali's contention that the only evidence presented at trial that he made a threat to expose his relationship with O'Brien was a threat made "a full 2 ½ years prior to the alleged charged offense." Pet'r. Br. 7/9/2010, at 16.

Nali also asserts that the voice mails he left on O'Brien's answering machine between September 2, 2002 and September 16, 2002, did not contain a renewed threat to reveal the videotapes. He argues that the voice mails simply urged O'Brien to "get help for all your problems."

Nali's recorded voice mail messages were replete with language concerning the need for O'Brien to be "punished." For example, in the second voice mail, Nali stated, in part: "You're being punished for all the lies you were telling me constantly on all

those occasions. . . . Like a little child you need to be punished." (R 70-1, Transcribed Telephone Messages, 1.)  In the third voice mail, Nali stated: "You have to understand . . . that if you will not change you continue to pay and be punished for the things you do." (*Id.*)  In the sixth voice mail Nali stated:  "You destroyed our relationship and don't think you can hide behind your friends because, you know, eventually its going to catch up to you.  Everybody's going to know, eventually it's all going to catch up to you.  Y[o]ur family will know, everybody's going to know, so you have to get help.  I'm only saying all these things because I really love you and you know me inside and out that I do." (*Id.* at 2.)  In the ninth voice mail, Nali stated: "Well, now that you've heard what I had to say I'd like to make a deal with you, so if you'll give me a call I'd like to discuss it with you." (*Id.* at 3.)  In the tenth voice mail Nali stated: "You need to get with me and discuss these things because there are certain things that I want to talk with you *to see what to do with them, O.K.*?  You might have a good idea of what I'm talking about." (*Id.* (emphasis added).)  In the twelfth voice mail, Nali stated: "Now everyone has to pay for the wrongs that they do to other people.  Now, when you do wrong to me there are consequence to those behavioural actions - you should have to pay for it.  Whether you call it punishment, consequence or whatever, that's how life is." (*Id.* at 4.)  In the fourteenth voice mail Nali stated: "I love you and I have no intention of being with anyone else . . . I only want to have sex with you because I love you and everybody else already has some kind of disease that I do not want to catch, so I hope you will come to me as well. I love you. Goodbye." (*Id.*)

In the fifteenth voice mail, Nali stated:

This is my last lot of messages that you're going to get, so, um, just in case I did not get it right when you referred to 'it', saying that if it happened again that would be the last time.  In the context in which you said it, I made one conclusion and explained that to you.  If, however, the 'it' meant so called [sic] threats that you have referred to in the past, then let me explain.  You can never threaten someone by telling the truth.  Anothe[r] word that you have used is 'blackmail.'  You also cannot blackmail someone by telling the truth.  However, to blackmail someone means you have to extort something from the person you are blackmailing.  Now, I have never said that I want anything from you in order to prevent me from telling the truth to your family.  Besides, the

only time that I have said anything about telling the truth is when you have said our relationship is over. So the 'it' that you mentioned and then this relationship that I have spent all my time and patience to foster, then you . . . . So now that you understand that I could never threaten or blackmail you by exposing the truth, then what was it I was doing? Hmmm . . . when your kids did anything wrong you would discipline them by, maybe, taking away a privilege or time out or, in some cases, some parents might spank their children. That discipline represents a relationship between behaviour and its consequences. As I have explained before, to every behaviour there is a consequence. Good behaviour produces good consequences, and these are referred to as rewards. We all reward our children when they do good things. Bad behaviour produces bad consequences, and there are called disciplinary actions. In the same manner as good behaviour is rewarded, bad behaviour must be punished. The action that is being punished is the behaviour. The action of the punishment is the responsibility of the parent. You don't say that the parent is mean and cruel because she made the child pay the consequences of his or her behaviour. It is a responisbility that must be carried out by the parent. IF the parent was not being responsible and disciplining the child, what would become of the child? The child would become YOU!

(*Id*. at 4-5.)

O'Brien did not respond to Nali's voice mails. Instead, she recorded them and reported Nali's conduct to the police. On September 13, 2002, O'Brien spoke to Detective Anthony Chalut of the Grosse Pointe Woods Department of Public Safety. (R 15-6, State Ct. Trial Tr., 02/26/03, 133-134.) That same day, Chalut contacted Nali to inform him of O'Brien's complaint. Nali denied making the calls. An hour later, O'Brien called Chalut to report that she had received another call from Nali. (Id.)

The evidence at trial shows that on about the 12th or 13th of September, 2002, James Amori, O'Brien's former husband, found a brown envelope in his mailbox addressed to his and O'Brien's daughter, Ami. It did not have a stamp or postal mark. At trial, O'Brien testified that the handwriting on the envelope appeared to be Nali's. Amori testified at trial that "a week before [he had] discovered [his] wife and Frank had been having an affair and it was just too suspicious so [he] opened it up." (Id. at 116:15-19.) He found a letter and a videotape. The letter addressed to O'Brien's daughter read:

> Mary has lied to everyone. It is time everyone know the truth about why she deserted her family and wanted to live in her own place. The enclosed video tells the whole story. This is what she said she wants to do. And she could not continue to do it if she did not leave her family. She says that she enjoys selling herself and will continue to do so. The video shows several scenes from some of her many films that she has made. The contents are very sensitive material and should not be viewed in the presence of anyone under the age of 21. She thinks that it is only fair that everyone in her entire family should know the truth so she can continue to do this without being secretive.

(*Id.* 64:21-65:9; People's Exh. 7.)

The videotape was labeled with six different scene names: Scene 1, Creamy Delight; Scene 2, Doggy Style; Scene 3, Double Doing; Scene 4, She Likes It Black; Scene 5, Double Pleasure; Scene 6, Riding the Big One. (*Id.* at 64:15-17.) Amori testified that he watched the videotape of "[his] wife and Frank in various sex acts." (*Id.* at 117:2-6.) After reading the letter and seeing the tape, he "sat down and cried." (*Id.* at 118:4.)

Two of O'Brien's brothers received similar packages. (*Id.* at 119:18-19, 123:6-9, 125:5-22, 131:6-9.) On September 16, 2002, O'Brien received a call from her brother Michael, who said his wife had opened a package addressed to him and it contained a letter and a videotape of Mary O'Brien having sex. The letter to Michael read as follows:

> The enclosed video contains very sensitive material and should not be viewed in the presence of anyone under the age of 21. It is time the truth be told. Mary has lied to everyone. The video shows exactly what she's been doing for many years. Was it coincidental that got divorced shortly after her son turned 21? It was all planned. She did not want any responsibilities toward her children anymore. She immediately found her own apartment so she could go on making these films without being constrained by living with her children. The material in the video shows x – excerpts from several films Mary has made. These videos are found in some places that sell these materials. The entire family should know. And it is hoped that you would inform them so these tapes would not have to be sent to all members of the family including her parents.

(*Id.* at 58:21-59:13.)

A fingerprint expert testified that the fingerprints lifted from the videotape sent to Michael O'Brien matched those of Frank Nali. (*Id*. at 12-13.)

On September 17, Mary O'Brien received a call from another of her brothers, Charles, who informed her that his wife had opened a package addressed to him and containing a letter and a videotape of O'Brien engaging in sex acts. (*Id*. at 44-45.) That letter read as follows:

> [T]he enclosed video contains sensitive material and should not be viewed in the presence of any individual under the age of 21. The video contains excerpts from various films that Mary has made in the past few years. Yes, she has been doing this for some years now.
>
> Everyone thought that her ex-husband was the bad guy because that is what she told the family. But as you will see she is the devil in person. She is a chronic pathological liar who has fooled everyone up to this point. She could not wait for her son to turn 21 so she could get a divorce, have no more responsibilities toward her children and finally leave the house. She quickly found her own place so she can continue to sell herself.
>
> . . . [W]e thought of sending this video to her parents but decided against it because of respect. But we do believe they should know and hope that you can inform them without having to show them the video.
>
> No one believed her ex-husband when he said that she was crazy and needed to seek professional help; that she was lying about screwing around. Everyone thought he was crazy. Whether the family apologizes to him is up to all of you. But at least now you know the truth.

(*Id*. at 62:10-63.)

Nali testified in his own defense. Nali told the jury that after O'Brien informed him she did not want to see him anymore, he "made phone calls to her answering machine because [he] wanted to give her some information, some helpful information . . . ." (R 67-1, State Ct. Trial Tr., 02/26/03, 15:6-8.) On cross examination, contrary to Chalut's testimony that Nali denied leaving the voice mails for O'Brien, Nali acknowledged that he left the messages. He explained that he left the messages because O'Brien "had problems understanding what happens when you behave in certain ways. She had problems realizing that she was a chronic liar, and she did not realize that this

would end up causing her problems in her life, and that's some of the help I wanted to provide to her." (*Id*. at 18:14-19.)

Nali denied distributing the letter and videotapes to O'Brien's daughter and brothers, even though his fingerprints were found on the evidence. (*Id*. at 24-26.) Nali testified that he might "have provided information on the letters [that accompanied the videotapes], but [he] didn't tell anybody to do it." (*Id*. at 27:11-12.) He also suggested that O'Brien had sent the tapes to her own family members. (*Id*. at 25.)

The evidence presented at trial was sufficient to allow a rational jury to infer, beyond a reasonable doubt, that one or more of Nali's communications to O'Brien, made during the period charged in the information, maliciously encompassed a threat. The transcript of the seventeen phone messages Nali left for O'Brien was replete with threats that she needed to be "punished for her bad behavior" and that he would be the one to punish her. A rational jury could infer, for example, that Nali's statement in his tenth recorded voice mail message, when he spoke of "certain things" that he wanted to talk to O'Brien about, "to see what to do with them," and that she "might have a good idea of what [he's] talking about," were obvious references to the sexually explicit videotapes he had previously threatened to send to her family and to publicize through the media.

Furthermore, a rational jury could also have concluded that Nali's testimony that he did not send the videotapes and letters was not credible in view of the contradictory fingerprint evidence presented at trial; or that Nali was not a credible witness because when Chalut called him on September 13, 2002, to investigate O'Brien's complaint, Nali denied leaving the messages for her, but later testified at trial that he did make the calls in an effort to "help" O'Brien. *See e.g., Nali v. Phillips*, 630 F. Supp. 2d 807, 815 (E.D. Mich. 2009) ("Regarding [Nali's] request to testify, it was trial counsel's trial strategy to advise [him] against testifying on his own behalf, but he did not agree. . . . [Nali] testified. When trial counsel talked to the jury after the verdict, the jury told him, and the prosecutor, that they were prepared to acquit [Nali] if he hadn't taken the stand.")

Taken together, this evidence was sufficient to allow a rational trier of fact to infer, beyond a reasonable doubt, that a malicious threat was made to damage her

reputation by revealing the videotapes to her family within the messages Nali left O'Brien. *See Davis v. Lafler*, 658 F.3d 525, 533 (6th Cir. 2011) ("Pieces of evidence are not to be viewed in a vacuum; rather, they are viewed in relation to the other evidence in the case."), *cert. denied*, No. 11–8868, 2012 WL 1252814 (U.S. Apr. 16, 2012).  The district court's finding that the evidence was insufficient to convict because "it is only by conjecture and speculation into the meaning behind [Nali's] remarks that one might construe them as veiled threats," *Nali*, 630 F. Supp. 2d at 818,  improperly invaded the province of the jury by re-weighing the evidence, *see Percin*, 47 N.W.2d at 31 ("[W]hether the necessary intent was shown [to prove that a threat was made is] a question to be decided by the jury from the facts before them."); *People v. Vaughn*, 465 N.W.2d 365, 368 (Mich. 1990) ("A trier of fact may make reasonable inferences from the facts of record.").  Based on the evidence presented at trial, a rational jury could have found beyond a reasonable doubt not only that Nali made a malicious threat to O'Brien, but also that he delivered on his threat to destroy her reputation by distributing the tapes to her family members.

**B**

Nali argues that "[a]s to the second element of extortion, the threatening of future injury to the person, property or family of another, the Michigan Court of Appeals unreasonably applied the law regarding this element." Pet'r. Br. 7/9/2010, at 17.  He asserts that "[e]ven if [his] phone messages were threatening, they still do not constitute extortion because the comments made in the voice-mail messages were not conditional in nature." Id. at 18.

"[T]he crime of extortion as defined in th[e] statute contemplates only threats of *future* harm and does not apply to present harm being inflicted." *People v. Fobb*, 378 N.W.2d 600, 601 (Mich. Ct. App. 1985) (referring to Mich. Comp. Laws § 750.213).  As the Michigan Court of Appeals explained in *People v. Krist*, 296 N.W.2d 139 (Mich. Ct. App. 1980):

> Prosecutions for statutory extortion have generally been characterized by threats of future harm if the victim does not comply with the

extortionist's wishes.  The victims in those cases were not confronted with the threat of immediate harm; the threatened injury was delayed, usually for hours or days, pending the victim's failure to act upon the extortionist's demands.

*Id.* at 143 (citations omitted).

With regard to the issue of extortion, the following colloquy occurred between Nali and the prosecutor at trial during Nali's cross examination:

> Q:    Now, Mr. Nali, you've testified before this jury that you never have threatened Ms. O'Brien in the past about revealing the truth of their- your relationship?
>
> A:    Right.
>
> Q:    Correct?  You've never threatened her?
>
> A:    I have never threatened her.
>
> Q:    Okay.  Then the message you left on Tuesday, the one that begins, "This is my last lot of messages you're going to get," and you were talking about "it," is it in the context in which you said it, and I'm going to ask if you said these things, okay?  In the context in which you said it I made one conclusion and explain that to you; if, however, the "it" meant so-called threats that you have referred to in the past. Do you recall making those statements?  Did you say that on the tape?
>
> A:    On the tape, yes.
>
> Q:    You did?  Okay.  Then let me explain you can never threaten someone by telling the truth.  Is that what you said?
>
> A:    Right.
>
> Q:    And another word that you used is "blackmail."  Has anybody used that word in the past with you?
>
> A:    As I recall, she did on one occasion at least.
>
> Q:    All right.  You also – did you say this, "You also cannot blackmail someone by telling the truth." Is that-did you say that?
>
> A:    Yes.
>
> Q:    "However to blackmail someone means that you have to extort something from the person that you are blackmailing."  Is that what you said?
>
> A:    Yes.
>
> Q:    Okay.  "Now I have never said that I wanted anything from you in order to prevent me from telling the truth to your family."  Did you say that?
>
> A:    OK.  Yes.

Q:    And did you say, sir, "Besides, the only time that I have said anything about telling the truth is when you have said our relationship is over." Did you say that?

A:    Yes --

Q:    Okay. Thank you.

A:    *[T]hat is absolutely true.*

*                              * * *

Q:    *You didn't threaten to expose the nature of the relationship to her parents?*

A:    *No. The only thing, as you just read now, is that I said I will tell the truth. And that was when she said it was over.* (R. 67-1, State Ct. Trial Tr., 02/26/03 at 33:22-36:10 (emphasis added).)

Thus, Nali admitted in his testimony that he threatened to tell the "truth," if O'Brien were to end the relationship once and for all. (*Id.* at 12:11-18.) This evidence was sufficient to allow a rational jury to infer that the "truth" Nali referred to in the voice mail message he testified about at trial was an obvious reference to his prior threats to reveal the affair and videotapes to O'Brien's family, should she go through with ending their relationship.

Furthermore, as the Michigan Court of Appeals noted in its decision in this matter, the evidence at trial showed that "[b]etween September 6 and 12, 2002, [Nali] left 17 telephone messages with [O'Brien] indicating that there would be consequences to her conduct, that she deserved to be punished, and that he would be the person to do it." *Nali*, 2005 WL 3556110, at *2. Prior to that, Nali had made numerous threats to O'Brien that he would expose the videotapes of their sexual escapades to her family if she tried to leave him. This evidence was sufficient to allow a rational jury to infer, beyond a reasonable doubt, that the "consequences" Nali referred to throughout his voice mail messages in early September 2002, constituted a threat to destroy O'Brien's reputation *in the future*, unless she agreed to resume her sexual relationship with him.

## C

Nali also maintains that "[t]here was insufficient evidence as to the third element of the offense: the intent to compel [O'Brien] to do or not to do some act against her will." Pet'r. Br. 7/9/2010, at 18. He asserts that the evidence shows that "[she] felt

frightened by [Nali's] alleged threats in 2000.  She felt trapped and devastated, seeing no way out. It was her position that she continued seeing [Nali] out of fear.  However, this was not the conduct charged." Id. at 19.  Nali contends that the evidence shows that O'Brien was not coerced by his alleged threats to act against her will because "[s]he continued seeing Nali for ten years, even when he left the area for a full consecutive seven months." *Id.*

Viewing the evidence presented at trial in this matter in the light most favorable to the prosecution we are persuaded that a rational trier of fact could find beyond a reasonable doubt that Nali's threats to O'Brien during the time period charged in the information were intended to compel her to continue her sexual relationship with him to avoid personal disgrace. *Jackson*, 443 U.S. at 319.  The jury's finding that Nali intended to compel O'Brien to resume the relationship against her will is supported by the evidence of the threats in the voicemail messages Nali left O'Brien between September 6, 2002 and September 12, 2002, which repeated by inference his earlier-made threats to punish her by exposing the videotapes of their sexual encounters to her family and the media unless she agreed to resume or continue her affair with him.

In granting Nali's application for a writ of habeas corpus, the district court substituted its judgment for the jury's finding that his guilt was proven beyond a reasonable doubt in violation of this Court's clear holding in *Johnson v. Mitchell*, 585 F.3d 923 (6th Cir. 2009), that a reviewing court must not reweigh the evidence, determine the credibility of witnesses or substitute its own determination of guilt for that of a jury. *Id.* at 931.  For example, the district court erroneously substituted the jury's finding that a threat was made by Nali, with its own contrary findings that the "the voice-mail messages . . . demonstrate[] only the anger and the frustration of a scorned lover," and "that Petitioner's conduct in this case, though spiteful and vengeful, does not represent the type of behavior made criminal as extortion." *Nali*, 630 F. Supp. 2d at 819.

The Michigan Court of Appeals' determination that "[v]iewed in a light most favorable to the prosecution, the evidence was sufficient to enable a reasonable jury to find beyond a reasonable doubt that defendant maliciously threatened to injure the victim

with the intent to compel her not to break up with him," *Nali*, 2005 WL 3556110, at *2, was not contrary to the Supreme Court's decision in *Jackson*.

## III

On cross-appeal, Nali challenges his conviction on the ground that he was denied the effective assistance of counsel at trial. The State argues that Nali failed to exhaust his state remedies in connection with his ineffective assistance of counsel claim because he did not properly present the claim to the Michigan Court of Appeals. The State also maintains that Nali is not entitled to relief on his ineffective assistance of counsel claim because he failed to demonstrate that he was prejudiced as a result of his trial counsel's alleged errors.

An issue not addressed by either party concerns the district court's *sua sponte* decision to hold an evidentiary hearing regarding Nali's ineffective assistance of trial counsel claim. Under the Supreme Court's instruction in *Pinholster*, a district court's "[r]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. at 1398. Accordingly, we must first decide whether the Michigan Court of Appeals adjudicated Nali's ineffective assistance of trial counsel claim on the merits when it ruled that Nali's motion to remand the matter for an evidentiary hearing did not set forth sufficient facts to demonstrate that his trial counsel was ineffective. If Nali's ineffective assistance of counsel claim was adjudicated on the merits by the Michigan Court of Appeals, we next determine whether the court reasonably applied federal law as established in *Strickland v. Washington*, 466 U.S. 668 (1984).

## A

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009).

"Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim."**[2]** *Id.* at 414-15. A Michigan petitioner must present each ground to that state's courts before seeking federal habeas corpus relief. *Mohn v. Bock*, 208 F. Supp. 2d 796, 800 (E.D. Mich. 2002). The petitioner bears the burden of showing that state court remedies have been exhausted. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

The gravamen of the inquiry here is not whether Nali raised the claim in the procedurally appropriate manner, but whether the state courts had the opportunity to adjudicate Nali's claim on the merits. *See, e.g.*, *Cottenham v. Jamrog*, 248 F. App'x 625, 633-34 (6th Cir. 2007) (unpublished opinion) (finding a petitioner's claim was presented to the court of appeal through numerous letters and *pro se* motions rejected by the court); *Elmore v. Foltz*, 768 F.2d 773, 775 (6th Cir. 1985) (finding petitioner properly presented his ineffective assistance of counsel claim to the Michigan Court of Appeals in a motion to remand while his direct appeal was pending before it). If Nali's ineffective assistance of trial counsel claim was considered on the merits, notwithstanding the fact it was presented in a procedurally incorrect manner, there is no exhaustion problem. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989) (recognizing an exception to the exhaustion requirement where the State has actually passed upon the claim).

As part of his direct appeal with the Michigan Court of Appeals, Nali filed a *pro se* motion to remand so that the trial court could hold an evidentiary hearing to develop the factual record as to his ineffective assistance of trial counsel claim. In the motion, Nali set forth twenty-eight specific grounds as to why he was denied the effective assistance of counsel at trial and the legal basis for his claim. The Court of Appeals denied Nali's motion to remand "for [petitioner's] failure to persuade the Court of the need to remand" the case at that time. Nali filed an application with the Michigan

---

**[2]**28 U.S.C. § 2254(b)(1)(B) recognizes two exceptions to the exhaustion requirement. One is where "there is an absence of available State corrective process." § 2254(b)(1)(B)(i). The other is where "circumstances exist that render such process ineffective to protect the rights of the applicant." § 2254(b)(1)(B)(ii). Neither exception applies to this case.

Supreme Court seeking leave to appeal the December 29, 2005 judgment of the Michigan Court of Appeals affirming his conviction wherein he raised twelve claims, including his claim that he was denied effective assistance of trial counsel as guaranteed by the Sixth Amendment.  The Supreme Court of Michigan denied Nali's application because it was "not persuaded that the questions presented [by petitioner] should be reviewed" by the Court.  Nali's ineffective assistance claim was thus adjudicated on the merits in the state courts.  *See Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 784-85 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

**B**

Nali argued in the motion for a remand that his trial counsel lacked general and specific knowledge of his case; failed to respond to his letters and requests for information concerning trial strategy; was unprepared for trial because he did not adequately investigate the case; failed to obtain O'Brien's divorce records as Nali requested; failed to hire a fingerprint or handwriting expert as Nali requested; and failed adequately to impeach O'Brien or to question her about her access to the sexually explicit tapes, among other claims. (R. 1-2, Appl. for Writ of Habeas Corpus, 34.)

Under the two-part test for the review of ineffective assistance of counsel claims established by the Supreme Court  in *Strickland*,  the first step is to determine whether counsel's performance "'fell below an objective standard of reasonableness.'" *Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting *Strickland*, 466 U.S. at 688).  The second step is to determine whether "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).   "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 131 S. Ct. at 1403 (quoting *Richter*, 131 S. Ct. at 791).  If a petitioner fails to satisfy either prong of the *Strickland* test, the court need not consider the other prong.  *Strickland*, 466 U.S. at 697.

Nali's allegations in his motion for a remand do not demonstrate that he was prejudiced by any of his counsel's alleged deficiencies because he has not established a reasonable probability that the outcome of the trial would have been different but for his attorney's alleged ineffectiveness. Nali did not demonstrate in his motion that additional communication with his attorney or the introduction of O'Brien's divorce records would likely have changed the result at trial. Nali also has not demonstrated that the testimony of a handwriting or other expert would have been material in demonstrating that he was not guilty. Moreover, Nali also failed to establish a reasonable probability that his counsel's alleged failure to call additional witnesses affected the outcome of the trial. Therefore, because Nali failed to establish that but for these alleged errors there is a "substantial" likelihood that the outcome at trial would have been different, *id.* at 694, the Michigan Court of Appeals' decision to deny his ineffective assistance of counsel claim was not contrary to *Strickland*.

## IV

For the reasons set forth above we REVERSE the district court's order unconditionally granting Nali's petition for a writ of habeas corpus. We also REVERSE the district court's order vacating and setting aside Nali's conviction for extortion, and its order directing Respondent-Appellant Warden Thomas Phillips to release Nali from custody.

The district court is hereby instructed to issue an order reinstating Nali's conviction and sentence for extortion. We further direct the district court to order that Nali be arrested forthwith and committed to the custody of Respondent-Appellant Warden Thomas Phillips to serve the remainder of his prison sentence.

We AFFIRM the district court's denial of habeas corpus relief on Nali's ineffective assistance-of-counsel claim. The case is REMANDED to the district court for entry of an order in compliance with this decision.