# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KIRSTA BETH ZAHRAIE,

        Defendant-Appellant.

UNPUBLISHED
July 9, 2015

No. 321724
Tuscola Circuit Court
LC No. 13-012923-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JAMSHID BAKSHI ZAHRAIE,

        Defendant-Appellant.

No. 321835
Tuscola Circuit Court
LC No. 13-012924-FH

---

Before: O'CONNELL, P.J., and OWENS and M. J. KELLY, JJ.

PER CURIAM.

These consolidated appeals as of right arise from convictions in a joint jury trial. Defendants Kirsta Beth Zahraie and Jamshid Bakshi Zahraie were each found guilty of conducting an enterprise through a pattern of racketeering activity (racketeering), MCL 750.159i(1); unlawful possession of a controlled substance with intent to deliver, MCL 333.7212(1)(e) and MCL 333.7401(2)(b)(*ii*); unlawful manufacture of a controlled substance, 333.7212(1)(e) and MCL 333.7401(2)(b)(*ii*); unlawful delivery of a controlled substance, MCL 333.7212(1)(e) and MCL 333.7401(2)(b)(*ii*); unlawful possession of a controlled substance, MCL 333.7212(1)(e) and MCL 333.7403(2)(b)(*ii*); and maintaining a drug house, MCL 333.7405(1)(d) and MCL 333.7406. The trial court sentenced Kirsta to prison terms of 3 to 20 years for the racketeering conviction, 2 to 7 years each for the convictions of unlawful manufacture of a controlled substance and unlawful delivery of a controlled substance, and 1 to 2 years each for the convictions of unlawful possession of a controlled substance and maintaining a drug house. The trial court sentenced Jamshid as an habitual offender, third offense, MCL 769.11, to prison terms of 15 to 40 years for the racketeering conviction, 4 to 14 years each for

-1-

the convictions of unlawful possession of a controlled substance, unlawful manufacture of a controlled substance, and unlawful delivery of a controlled substance, and 1-1/2 to 4 years for the convictions of maintaining a drug house.

FACTS

On June 30, 2012, Michigan State Police (MSP) troopers in Tuscola County participated in an MSP initiative to advise store owners that K2 and other types of synthetic marijuana would be illegal as of July 1, 2012.[1] Trooper Nathan Hopp advised Jamshid, the owner of Gran's Party Mart and the Clark gas station in Caro, and his ex-wife, Kirsta, who was working at Gran's on that day, of the impending change in the law. Of the thirty-eight stores visited that day in Tuscola County as part of the initiative, troopers observed synthetic marijuana only at Gran's and the Clark station.

Lapeer police detective A. J. Wetzel, a member of the TNU, participated in a controlled purchase of suspected synthetic marijuana at Gran's on July 20, 2012, after receiving several tips that synthetic marijuana was being sold at the store. Jamshid told Wetzel that he was sold out of a brand of synthetic marijuana known as "Spice," but showed Wetzel the different types of synthetic marijuana that he had. Wetzel purchased one packet of "Skunk" for $20 and one packet of "Sativa" for $15. Jamshid indicated that these brands were not as good as Spice, but were smokable. Wetzel made a second controlled purchase of suspected synthetic marijuana at Gran's on August 22, 2012. Kirsta told Wetzel that a brand called "Sachet" was not available and that they only had what was under the counter. Wetzel purchased one packet of "Blue Jay" from Kirsta for $15 or $20. When Wetzel asked Kirsta if Blue Jay would get him high, Kirsta said that "everyone was buying it so it must be okay."

Both Jamshid and Kirsta were present at Gran's during an administrative tobacco inspection led by MSP trooper Michael Leddy on January 17, 2013. Trooper Leddy observed brands of synthetic marijuana known as K3, Super Nova, and Diesel in a glass display in an area containing smoking apparatuses, glass pipes, and rolling papers. A large amount of several brands of synthetic marijuana was also found in boxes in three separate unlocked basement rooms. Jamshid stated that he had removed the illegal products from the shelves and put it in the basement and that he did not know that the products in the glass case were illegal. MSP Trooper Andrew Feehan testified that he informed Jamshid on this date that he could not sell synthetic marijuana. A total of 40 pounds of suspected synthetic marijuana was seized and a sample of

---

[1] According to Trooper Andrew Feehan, a member of the Thumb Narcotics Unit (TNU), the law regarding synthetic marijuana had frustrated investigations over the years because the controlled substances act initially listed certain chemicals that must be in a drug in order for the drug to be a schedule 1 controlled substance. Chemists would alter the chemical content of a drug so that the new chemical composition did not contain chemicals listed in the statute, but the effects of the new drug on people would be the same. Feehan explained that the act lagged behind the development of new chemicals. On July 1, 2012, the controlled substances act was amended to add a catchall provision to cover chemical compounds, known as cannabinoid receptor agonists, that were not specifically on the list of controlled substances.

each brand was sent to the crime laboratory for analysis. According to Leddy, no field test for synthetic marijuana is available. The laboratory report indicated that substances known as AM-2201, XLR-11, UR-144, and EAM-2201 were found in the tested samples. The report indicated that AM-2201 is a schedule 1 controlled substance in Michigan, and that XLR-11 was not presently a listed controlled substance under Michigan or federal law.

Kirsta was present at Gran's during a second administrative tobacco inspection led by MSP detective-sergeant Michael Foley on March 27, 2013. According to Foley, Kirsta was uncooperative and refused to provide identification. During the inspection, Foley observed several packets of suspected synthetic marijuana under a glass counter, in a grocery bag that Kirsta had attempted to hide, and in the basement. Approximately 1,400 packets of suspected synthetic marijuana were seized from Gran's that day. XLR-11 was detected in five of the sample packets that were analyzed by the crime laboratory.

Detective Jason Miner participated in a controlled purchase of suspected synthetic marijuana at Gran's on April 25, 2013. In response to Miner's request for Spice, Kirsta said that they had an all-natural product called Super Nova. Miner purchased one packet of Super Nova from Kirsta for $15. A laboratory analysis indicated that the sample contained XLR-11. Trooper Feehan testified that he told Jamshid and Kirsta that they could not sell products containing XLR-11.

On April 29, 2013, Jerry Donley made a controlled purchase of suspected synthetic marijuana at the Clark station. Donley told Kirsta that he wanted to purchase Spice, and she told him that Spice was no longer available but that other smokable products similar to Spice were available. Donley purchased one package each of two different brands for $25, and Kirsta provided free rolling papers. Laboratory analysis of the product detected the presence of XLR-11.

On May 2, 2013, members of the TNU executed search warrants at the Clark station, at Gran's, and at the apartment that Jamshid and Kirsta shared. 585 packets of Super Nova marked "Not for human consumption" and $114,024 in cash were seized from the Clark station. Troopers also found an invoice for the purchase of $3,100 worth of Super Nova from a company called Clear Smoke. During the search at Gran's, approximately 50 packets of K3 and Super Nova were found in a glass case and under the front counter, and several thousand empty silver packets were found in the basement. The empty packets were the same as the filled packets but did not contain a label or substance. A laboratory analysis of the Super Nova sample detected XLR-11.

During the search of the apartment, troopers found a total of 2,223 packets of suspected synthetic marijuana, including 1,300 packets of Super Nova packaged in 1.5 gram, 3.5 gram, and 6 gram packets. Several pounds of plant material, flavorings, foil packets, acetone, scales, measuring cups, syringes, trays, labels, grinding utensils, and a recipe for synthetic marijuana using the controlled substance JWH-018. According to MSP Lieutenant Doug Rogers, an expert on possession with intent to deliver narcotics, the items seized suggested that synthetic marijuana was being manufactured for distribution. Laboratory analysis of the samples seized from the apartment showed that JWH-018 was found on loose plant material in Ziploc baggies that were found in the pantry. Another baggie containing loose plant material and a flavoring bottle

contained XLR-11. A packet of a brand of synthetic marijuana called "Scooby Snax" that was found in the pantry contained the controlled substance AM-2201. The Super Nova packets found in the pantry showed the presence of XLR-11. Bulk bags in the pantry that were labeled "Stratosphere" contained controlled substances JWH-250, JWH-018, and AM-2201. A packet labeled "Magnolia Rush II Max" that was found in the pantry contained XLR-11.

Dr. Gregory Endres, an expert in organic chemistry in the identification, classification, manufacture, and pharmacological effects of synthetic marijuana, opined XLR-11 is a schedule 1 controlled substance under the controlled substances act as amended on July 1, 2012.

Jamshid acknowledged that troopers told him on June 30, 2012, that all synthetic marijuana was becoming illegal. Jamshid believed that the Super Nova he purchased from Clear Smoke was legal based on a disclaimer that he read on the internet and a laboratory report from the vendor. He admitted that he made K3 using a base leaf of damiana leaf and lavender bud to which he added flavoring, and that he continued to sell K3 because he believed it was legal. Jamshid admitted that he had a recipe for making synthetic marijuana that contained JWH-018, but he denied making any products using the recipe. Jamshid testified that some of his customers smoke K3 and some use it for aromatherapy; approximately 15 to 20 percent of his gross sales are from the sale of Super Nova and K3. Jamshid testified that the synthetic marijuana the troopers found in the basement at Gran's was the product that he had removed from the store shelves because it contained chemicals and was illegal. He explained that the large amount of cash seized from the gas station came from a settlement with his former employer in 2001 and from real estate transactions. Jamshid testified that Kirsta is not his employee, that they are divorced, and that she rents a room from him for so that she can assist with the care of their children. He testified that Kirsta does not work at his stores and that she merely covers for him for a half-hour or an hour when he has errands to run.

Kirsta testified that she was divorced from Jamshid and that she moved in with him in 2009 because he needed help with their children. She stated that she had her own bedroom in the apartment and that she paid $250 in monthly rent. Kirsta testified that she is not Jamshid's employee, that she receives no pay, that she does not own any businesses, and that she does not assist with the business records or accounting at Gran's or the Clark gas station. She admitted that she assisted Jamshid at his stores two days a week. Kirsta testified that she did not know that the products she was selling contained a controlled substance and that she relied on Jamshid's statements that the substances they were selling were legal. Kirsta denied ever seeing Jamshid make synthetic marijuana or sell it from their apartment. She also denied knowledge of the items in the pantry, with the exception of cleaning items and acetone for her fingernails.

I. MCL 333.7212(1)(e)

The offenses with which defendants were charged prohibited the unlawful possession with intent to deliver, unlawful manufacture, unlawful delivery, unlawful possession, and

-4-

keeping or selling, a controlled substance – specifically, synthetic cannabinoids (marijuana). At the time of defendants' arrests,[2] MCL 333.7212(1) provided, in relevant part:

The following controlled substances are included in schedule 1:

* * *

(e) Synthetic cannabinoids. As used in this subdivision, "synthetic cannabinoids" includes any material, compound, mixture, or preparation that is not otherwise listed as a controlled substance in this schedule or in schedules II through V, is not approved by the federal food and drug administration as a drug, and contains any quantity of the following substances, their salts, isomers (whether optical, positional, or geometric), homologues (analogs), and salts of isomers and homologues (analogs), unless specifically excepted, whenever the existence of these salts, isomers, homologues (analogs), and salts of isomers and homologues (analogs) is possible within the chemical designation:

[subsections (*i*) through (*ix*) describe specific chemical compounds][3]

(*x*) Any other synthetic chemical compound that is a cannabinoid receptor agonist and mimics the pharmacological effect of naturally occurring cannabinoids that is not listed in schedules II through V and is not approved by the federal food and drug administration as a drug.

Defendants argue that the catchall language of MCL 333.7201(1)(e)(*x*) is unconstitutionally vague because it did not adequately notify them that XLR-11 was illegal because a reasonable person does not know which substances are cannabinoid receptor agonists and mimic the effect of naturally occurring cannabinoids. Jamshid also argues that the statute conferred unfettered discretion on the trier of fact to determine whether a compound "mimics the pharmacological effects of naturally occurring cannabinoids."

A statute is presumed to be constitutional and will be construed as such unless its unconstitutionality is clearly apparent. *People v Hubbard (After Remand),* 217 Mich App 459, 483–484; 552 NW2d 493 (1996), overruled in part on other grounds by *People v Harris,* 495 Mich 120, 123; 845 NW2d 477 (2014), and *People v Bryant,* 491 Mich 575, 618; 822 NW2d 124 (2012). The constitutional doctrines of vagueness and overbreadth are distinct doctrines, but they are related in the sense that both curb arbitrary and discriminatory enforcement. *Van Buren Twp v Garter Belt, Inc,* 258 Mich App 594, 628; 673 NW2d 111 (2003). A penal statute is unconstitutionally vague or overbroad if "(1) it does not provide fair notice of the conduct

---

[2] MCL 333.7212(1)(e) was added by 2012 PA 183, effective July 1, 2012. The Legislature amended the statute, 2013 PA 268, effective December 20, 2013; the changes are not pertinent to this appeal.

[3] MCL 333.7212(1)(e)(*i*) specifically lists JWH-018 and AM-2201; MCL 7212(1)(e)(*v*) specifically lists JWH-250.

proscribed, (2) it confers on the trier of fact unstructured and unlimited discretion to determine whether an offense had been committed, or (3) its coverage is overly broad and impinges on First Amendment Freedoms." *People v Vronko,* 228 Mich App 649, 652; 579 NW2d 138 (1998). "The doctrine of overbreadth is primarily applied to First Amendment cases where an overbroad statute prohibits constitutionally protected conduct." *People v Cavaiani,* 172 Mich App 706, 711; 432 NW2d 409 (1988). In this case, defendants do not assert that the application of MCL 333.7212(1)(e)(*x*) impinges on any First Amendment freedoms or other constitutionally protected activity. Accordingly, the doctrine of overbreadth does not apply. *Vronko,* 228 Mich App at 652. "When a defendant's vagueness challenge does not implicate First Amendment freedoms, the constitutionality of the statute in question must be examined in light of the particular facts at hand without concern for the hypothetical rights of others." *Id.*

"A statute provides fair notice when it gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *People v Gratsch,* 299 Mich App 604, 610; 831 NW2d 462 (2013), vacated on other grounds 495 Mich 876 (2013). "To evaluate a vagueness challenge, this Court must examine the entire text of the statute and give the words of the statute their ordinary meanings." *People v Hrlic,* 277 Mich App 260, 263; 744 NW2d 221 (2007). "Reference to a dictionary is appropriate to determine the ordinary meaning of a word." *People v Wilson,* 230 Mich App 590, 592; 585 NW2d 24 (1998). A statute may not use a term that requires persons of ordinary intelligence to speculate about its meaning and differ about its application, but "[a] statute is sufficiently definite if its meaning can fairly be ascertained by reference to judicial interpretations, the common law, dictionaries, treatises, or the commonly accepted meanings of words." *Gratsch,* 299 Mich App at 610 (citation and quotation marks omitted). The party challenging the constitutionality of a statute bears the burden of proving that the law is unconstitutional. *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71,* 479 Mich 1, 11; 740 NW2d 444 (2007).

The record reveals that JWH-250, JWH-018, and AM-2201 were found during the execution of the search warrant at defendants' apartment on May 2, 2013. These chemical compounds are specifically listed as synthetic cannabinoids in MCL 333.7212(1)(e)(*i*) and (*v*). Additionally, AM-2201 was found at Gran's during an inspection on January 17, 2013. Therefore, even if the catchall definition for synthetic cannabinoids in MCL 333.7212(1)(e)(*x*) were found to be unconstitutionally vague, defendants' convictions would still stand in the absence of the evidence of XLR-11. "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *People v McKinley,* 496 Mich 410, 415-416 n 4; 852 NW2d 770 (2014), quoting *Ashwander v Tenn Valley Auth,* 297 US 288, 347; 56 S Ct 466; 80 L Ed 688 (1936).

## II. SUFFICIENCY OF THE EVIDENCE

Kirsta argues that the prosecutor failed to present sufficient evidence to sustain her convictions of racketeering, manufacturing a controlled substance, and maintaining a drug house. "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, [appellate courts] review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Anthony,* 494 Mich 669, 676; 837 NW2d 415 (2013) (citation and internal quotation

-6-

marks omitted). While this Court reviews the sufficiency of the evidence de novo, it must be careful to not interfere with the factfinder's role of determining the weight of evidence or the credibility of witnesses. *People v Wolfe,* 440 Mich 508, 514; 489 NW2d 748 (1992) (citations omitted). This Court must also defer to the finder of fact when reviewing what inferences and weight should be made and given to the evidence. *People v Hardiman,* 466 Mich 417, 428; 646 NW2d 158 (2002). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowak,* 462 Mich 392, 400; 614 NW2d 78 (2000).

The prosecutor presented an aiding and abetting theory to the jury under MCL 767.39, which provides:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried, and on conviction shall be punished as if he had directly committed such offense.

A conviction of aiding and abetting requires proof that (1) the underlying crime was committed by either the defendant or some other person, (2) the defendant performed acts or gave encouragement that aided and abetted or assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time of giving aid or encouragement. *People v Smielewski*, 237 Mich App 196, 207; 596 NW2d 636 (1999).

In order to prove the charge of racketeering, the prosecutor had to prove that Kirsta was "associated" with an "enterprise" and that she "knowingly" participated "in the affairs of the enterprise directly or indirectly through a pattern of racketeering activity." MCL 750.159i(1); *People v Martin,* 271 Mich App 280, 320; 721 NW2d 815 (2006). A pattern of racketeering activity means "the commission of not less than two incidents of racketeering", which involve "'the same or a substantially similar purpose, result, participant, victim, or method of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated acts'", "'pose a threat of continued criminal activity'", and fall within certain time constraints that are not relevant here. See *Martin,* 271 Mich App at 289–290, quoting MCL 750.159f(c). The prosecutor also had to prove that Kirsta committed, attempted to commit, conspired to commit, or aided and abetted, solicited, coerced, or intimidated a person to commit the underlying racketeering offenses for financial gain. *Id.* at 290, citing MCL 750.159g.

At issue here is the element of financial gain. Kirsta concedes that the evidence showed that she personally made at least four sales of synthetic cannabinoids after July 1, 2012. She contends, however, that the evidence established that she put the money from the sales into the cash register and that she received no income or financial gain as a result of working in the stores. Kirsta has cited to no authority, however, to support her position that she had to personally receive funds from the sale of synthetic marijuana. Kirsta does not dispute that she assisted Jamshid by working at the stores and that she sold synthetic marijuana on no less than four occasions. Approximately $114,000 in cash was seized when the police executed a search warrant at the gas station. Viewed in a light most favorable to the prosecution, the evidence was

sufficient to show that Kirsta aided and abetted the predicate acts of the enterprise for financial gain.

In order to prove the charge of manufacturing a controlled substance, the prosecutor had to show that (1) the defendant manufactured a substance, (2) the substance manufactured was the controlled substance at issue, and (3) the defendant knowingly manufactured it. *People v Meshell,* 265 Mich App 616, 619; 696 NW2d 754 (2005). The manufacture of a controlled substance is defined as "the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and synthesis." MCL 333.7106(2); *People v Hunter,* 201 Mich App 671, 676; 506 NW2d 611 (1993).

Kirsta argues that she had no control over the portion of the apartment where the synthetic marijuana was being manufactured. Viewed in a light most favorable to the prosecution, the evidence showed that a recipe for synthetic marijuana and components of the manufacturing operation were discovered in the apartment that Kirsta shared with Jamshid. Eight of the nine ingredients in the recipe were found in an unlocked pantry. Kirsta sold the manufactured product in Jamshid's stores. The evidence was sufficient to allow a reasonable jury to conclude that Kirsta was aware of the manufacturing that was occurring in the apartment and that, at a minimum, she aided and abetted the manufacture of the synthetic marijuana.

Finally, the crime of maintaining a drug house is governed by MCL 333.7405(d), which provides that a person

> [s]hall not knowingly keep or maintain a store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place, that is frequented by persons using controlled substances in violation of this article for the purpose of using controlled substances, or that is used for keeping or selling controlled substances in violation of this article.

"The phrase 'keep or maintain' implies usage with some degree of continuity that can be deduced by actual observation of repeated acts or circumstantial evidence . . . that conduces to the same conclusion." *People v Thompson,* 477 Mich 146, 155; 730 NW2d 708 (2007).

Kirsta argues that the evidence was insufficient to sustain the conviction because she did not have control over the stores and therefore did not keep or maintain a store. Kirsta was the only employee present on some occasions at the stores and she personally and knowingly sold synthetic marijuana on no less than four separate occasions. Sufficient evidence was adduced for a rational trier of fact to find that Kirsta's actions aided and abetted Jamshid in keeping or maintaining the stores and that the stores were used for "keeping or selling" controlled substances with "some degree of continuity." MCL 333.7405(d); *Thompson,* 477 Mich at 155.

Jamshid argues that the evidence was insufficient to sustain his conviction of conducting a criminal enterprise because there was no evidence of criminal activity. He contends that the evidence did not show that he knew or should have known that the products he possessed were unlawful because the illegal nature of a substance cannot be determined by looking at it.

However, precise knowledge of the nature of a substance is not required for conviction as long as the defendant was aware that the product was a controlled substance. *People v Zion*, 93 Mich App 576, 578; 287 NW2d 6 (1979). Here, law enforcement officers informed Jamshid that K2 and synthetic marijuana would be illegal as of July 1, 2012. Jamshid had direct contact with law enforcement on at least three occasions and had a large quantity of synthetic marijuana confiscated on more than one occasion after July 1. Jamshid admitted that the products he had in the basement of Gran's were illegal. The jury could reasonably draw an inculpatory inference that Jamshid knew the substance to be a controlled substance from the evidence presented.

Jamshid further argues that there was no evidence presented that the sale of the alleged controlled substances was part of a criminal enterprise or that there was a concert of action between himself and Kirsta. He contends that Kirsta was merely someone who helped out in the stores and who had no interest in the business. Viewed in a light most favorable to the prosecution, the evidence revealed that Kirsta shared an apartment with Jamshid, that all of the components of a synthetic marijuana manufacturing operation were present in the apartment, that both Kirsta and Jamshid sold controlled substances in the stores, and that a large sum of cash was discovered in one of the stores. This evidence was sufficient to allow the jury to find that Jamshid and Kirsta engaged in a criminal enterprise.

Lastly, Jamshid argues that insufficient evidence was presented to support his remaining drug-related convictions because he did not know that the substances were controlled substances. As discussed above, however, the evidence was sufficient to allow the jury to infer that Jamshid knew or should have known that the substances he was making and selling were controlled substances.

## III. GUIDELINES SCORING

Kirsta argues that the trial court erred in scoring offense variables (OV) 3 and 9. Under the sentencing guidelines, the trial court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence. *People v Hardy,* 494 Mich 430, 438; 835 NW2d 340 (2013); *People v Rhodes (On Remand),* 305 Mich App 85, 88; 849 NW2d 417 (2014). This Court reviews de novo "[w]hether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute." *Hardy,* 494 Mich at 438.

OV 3 involves physical injury to a victim. MCL 777.33. MCL 777.33(d) authorizes a score of ten points where "[b]odily injury requiring medical treatment occurred to a victim." OV 9 involves the number of victims. MCL 777.39. MCL 777.39(1)(c) authorizes a score of ten points if "[t]here were 2 to 9 victims who were placed in danger of physical injury or death." With respect to OV 3, Kirsta could be considered responsible for Lance Bell, Jr.'s injuries even though she did not personally sell the synthetic marijuana that caused his injuries. Aiding and abetting Jamshid was sufficient to support the trial court's score of ten points for OV 3. Additionally, MCL 777.33(2)(a) directs that for "multiple offender cases," if one offender is assessed points under the variable, "all offenders shall be assessed the same number of points." The multiple offender provision applies to the scoring of Kirsta's guidelines in this case. See *People v Morson*, 471 Mich 248, 260 n 13; 685 NW2d 203 (2004). Because the trial court scored 10 points for OV 3 for Jamshid, the trial court was obligated to score 10 points for OV 3.

Similarly, with respect to OV 9, Kirsta could be considered responsible for those placed in danger of physical injury or death as a result of ingesting synthetic marijuana obtained from Jamshid's stores. Lance Bell, Jr., had a seizure after smoking the synthetic marijuana obtained from Jamshid. Lance Bell, Sr., bought synthetic marijuana from Jamshid and testified that it "messed him up good." Blaine McGowan's brother, Cashel Ferguson, purchased synthetic marijuana from Jamshid and became ill after smoking it. Given this evidence, there were between two and nine victims who were placed in danger of physical injury, which justified the trial court's assessment of ten points for OV 9.

## IV. OTHER ACTS EVIDENCE

Jamshid argues that the trial court abused its discretion by admitting evidence relating to prior purchases of synthetic marijuana from his stores because the evidence was not sufficiently similar to the crimes with which he was charged and was offered for an improper purpose. We review a preserved issue regarding the admission of evidence for an abuse of discretion. *People v Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002).

Generally, all relevant evidence is admissible unless otherwise provided for in the court rules or the state or federal constitutions. MRE 402; *People v Yost,* 278 Mich App 341, 355; 749 NW2d 753 (2008). Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403. "Evidence of a person's character or a trait of character is not admissible for the purposes of proving action in conformity therewith." MRE 404(a). MRE 404(b) (1) governs admission of other acts evidence and provides the following:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

To be admissible under 404(b), other acts evidence must (1) be offered for something other than proving character or propensity, (2) be relevant, and (3) not have a probative value that is substantially outweighed by the potential for unfair prejudice. *People v Knox,* 469 Mich 502, 509; 674 NW2d 366 (2004). The trial court may also, upon request, provide a limiting instruction regarding prior bad acts evidence pursuant to MRE 105. *Id.*

Testimony regarding defendant's prior activity and transactions was not improper under MRE 404(b). Testimony that defendant possessed and sold synthetic marijuana to store patrons after being informed of the illegality of synthetic marijuana tends to show that defendant engaged in a criminal enterprise during the period alleged in the information. And, the evidence was sufficiently probative to outweigh any danger of unfair prejudice. Although the evidence was damaging to defendant's case, that alone is not enough to warrant exclusion under MRE

403; indeed, evidence should be excluded only when the danger of *unfair prejudice* outweighs the probative value of the evidence. Accordingly, the testimony regarding defendant's activity and transactions was admitted for a proper purpose to show that defendant engaged in a "scheme, plan, or system in doing an act." MRE 404(b).

## V. HABITUAL OFFENDER

Jamshid argues that he was denied due process of law because no separate hearing was held to determine the existence of the prior convictions. There is no merit to this issue. Jamshid did not challenge the accuracy or constitutional validity of the prior convictions by filing a written motion with the court. See MCL 769.13(4). Consequently, MCL 769.13(6) was not implicated. Rather, Jamshid's presentence investigation report (PSIR) demonstrates the existence of his two prior convictions. See MCL 769.13(5). When given the opportunity, Jamshid never objected to the validity or accuracy of the PSIR or the prior convictions during the sentencing hearing. Due process is satisfied where, as here, the sentence is based on accurate information and the defendant has a reasonable opportunity at sentencing to challenge the information. *People v Green*, 228 Mich App 684, 698; 580 NW2d 444 (1998).

## VI. RIGHT OF CONFRONTATION

Jamshid argues that his confrontation rights were violated by the admission of the hearsay testimony of Blaine McGowan and Tamara Mathys regarding the ill effects of synthetic marijuana on others who did not testify. Although defendant objected to admission of the evidence under MRE 404(b), defendant did not object to the evidence on the ground that it was hearsay or that admission of the evidence would violate his right of confrontation. An objection on one ground is insufficient to preserve an appellate issue on another ground. *People v Kimble*, 470 Mich 305, 309; 684 NW2d 69 (2004). We review this unpreserved claim of error for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

The rules of evidence address the right to confront witnesses. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). The admission of hearsay evidence is generally prohibited. MRE 802. Here, however, the basis for McGowan's and Mathys' testimony was their own personal observations. Accordingly, this testimony was not hearsay, as there was no out-of-court statement made by a declarant that formed the basis of either witness's testimony regarding their observations of others who had smoked synthetic marijuana that had been purchased from Jamshid's stores. Thus, their testimony was not hearsay and the admission of the evidence did not violate defendant's right of confrontation.

## VII. PROSECUTOR MISCONDUCT

Jamshid argues that the prosecutor committed misconduct by eliciting testimony from an expert witness that XLR-11 is a schedule 1 controlled substance within the catchall provision of MCL 333.7212(1)(e)(*x*). He contends that the testimony invaded the jury's fact-finding obligation and constituted an opinion on an ultimate conclusion of law. Jamshid did not object

to the testimony and, therefore, we review this unpreserved claim of error for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

Jamshid did not dispute at trial that XLR-11 was a controlled substance. Rather, his defense was that he did not know, and could not have known, that XLR-11 was a controlled substance. Assuming that the prosecutor committed misconduct by eliciting expert testimony that XLR-11 was a controlled substance, any error would be harmless. Jamshid has failed to demonstrate plain error affecting substantial rights.

## VIII. RIGHT TO PRESENT A DEFENSE

Jamshid argues the trial court's refusal to admit a laboratory report that Jamshid received from a vendor with his purchase of K3 denied him the right to present his defense that he believed that the substance was legal. Jamshid did not challenge the decision to exclude the evidence on the ground that it violated his constitutional right to present a defense. We review this unpreserved claim of error for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

The right to present a defense is a fundamental element of due process that allows a defendant the opportunity to present his or her version of the facts to the jury. *Washington v Texas,* 388 US14, 19; 87 S Ct 1920; 18 L Ed 2d 1019 (1967). However, this right is not absolute and "[t]he accused must still comply with 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Accordingly, defense counsel was required to follow the appropriate procedures when seeking to admit the lab report at trial.

Jamshid contends on appeal, as he did at trial, that the laboratory report was not hearsay. Hearsay "is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Thus, an out-of-court statement is not hearsay if it is offered for a purpose other than the truth of its contents. *People v Mesick (On Reconsideration),* 285 Mich App 535, 540; 775 NW2d 857 (2009). Here, the laboratory report was not offered for its truth but, rather, to explain why Jamshid believed that the product he was selling was legal. Thus, the purported evidence was not hearsay, and the trial court abused its discretion by requiring defense counsel to identify an exception to the hearsay rule.

However, defense counsel failed to comply with the evidentiary rules for presenting documentary evidence. The authentication or identification of evidence is a condition precedent to its admission, MRE 901(a), and when the admissibility of evidence is disputed, "the burden of establishing a proper foundation rests with the party seeking admission." *In re Brock,* 193 Mich App 652, 669; 485 NW2d 110 (1992), rev'd on other grounds 442 Mich 101 (1993). Evidence can be identified by the testimony of a witness with knowledge that the documents are what they are claimed to be, MRE 901(b)(1), or self-authenticated by an affidavit from the records custodian. MRE 902(11). Defense counsel did not call a witness to lay a foundation for admission of the laboratory report. Additionally, the court allowed Jamshid to testify that he read the laboratory report and that, on the basis of information contained in the report, he

believed that the product he was selling was legal.  Jamshid was not denied the opportunity to present a defense, and he has failed to establish plain error affecting substantial rights.

Affirmed.

/s/ Peter D. O'Connell
/s/ Donald S. Owens
/s/ Michael J. Kelly